# NO. 23-2330

In The

# United States Court Of Appeals

## For The Seventh Circuit

## LKQ CORPORATION,

*Plaintiff/Counter-Defendant- Appellant,*

v.

## ROBERT RUTLEDGE,

*Defendant/Counter-Claimant- Appellee.*

ON APPEAL FROM THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
THE HONORABLE THOMAS M. DURKIN, DISTRICT COURT JUDGE
CASE NO. 1:21-CV-03022

_____

## BRIEF AND REQUIRED SHORT APPENDIX
## OF PLAINTIFF/COUNTER DEFENDANT-APPELLANT

_____

Craig R. Annunziata
James M. Hux, Jr.
Joel W. Rice
FISHER & PHILLIPS LLP
Suite 3450
Ten S. Wacker Drive
Chicago, IL 60606
312-346-8061

*Counsel for Appellant*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2330

Short Caption: LKQ Corporation v. Robert Rutledge

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    LKQ Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Fisher & Phillips, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ James M. Hux, Jr.    Date: 7/12/2023

Attorney's Printed Name: James M. Hux, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ✔

Address: 10 S. Wacker Drive, Ste. 3450, Chicago, Illinois 60606

Phone Number: (312) 580-7809    Fax Number: (312) 346-3179

E-Mail Address: jhux@fisherphillips.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As     Clear Form

Appellate Court No: 23-2330

Short Caption: LKQ Corporation v. Robert Rutledge

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    LKQ Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Fisher & Phillips, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Craig R. Annunziata      Date: 7/12/2023

Attorney's Printed Name:  Craig R. Annunziata

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  10 S. Wacker Drive, Ste. 3450, Chicago, Illinois 60606

Phone Number: (312) 580-7816      Fax Number: (312) 346-3179

E-Mail Address: cannunziata@fisherphillips.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES......................................................................iv

INTRODUCTION.......................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

    A.   District Court Jurisdiction................................................3

    B.   Appellate Jurisdiction.........................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............5

STATEMENT OF THE CASE ...................................................................6

    A.   FACTUAL BACKGROUND.................................................6

        1.   Background Regarding LKQ Corporation.....................6

        2.   Rutledge's Employment As a Plant Manager with LKQ ..............................................................................7

            a.   Rutledge's Responsibilities as a Key Employee..............................................................7

            b.   Rutledge's Compensation and Stock Grants........9

        3.   Rutledge's Access and Use of LKQ's Confidential and Competitively Sensitive Business Information.....10

        4.   LKQ Designates Rutledge As a Key Employee Eligible to Receive Substantial Grants of LKQ Restricted Stock .........................................................11

i

     5.     Rutledge's Contractual Obligations to LKQ ............... 13

     6.     Rutledge Voluntarily Resigns His Employment with LKQ to Work for LKQ's Direct Competitor ......... 16

     7.     Rutledge Becomes a Southeast Area Manager for Fenix Parts, Overseeing Multiple Fenix Parts Facilities ....................................................................... 21

B.     COURSE OF PROCEEDINGS AND DISPOSITION BELOW ................................................................. 22

     1.     LKQ's Filing of the Lawsuit and Amendment of Pleadings ................................................................. 22

     2.     District Court Ruling on Rutledge's Motion to Dismiss ...................................................................... 23

     3.     District Court Ruling on Cross Motions for Summary Judgment ................................................... 24

SUMMARY OF THE ARGUMENT ..................................... 28

ARGUMENT ........................................................................ 31

     STANDARD OF REVIEW ............................................. 31

     DISCUSSION .................................................................. 32

I.     The Court Should Reverse the District Court's Order Granting Summary Judgment to Rutledge on Count I of the Complaint and Denying Summary Judgment for LKQ ................................................................................. 32

     A.     The RSUAs Are Valid and Enforceable Forfeiture Agreements Analytically Distinct From Non-Compete Agreements ................................................... 32

B.     The Ainsle Decision Does Not Support the Court's Finding on Count I ........................................................ 41

C.     The District Court's Ruling Also Is Based on Other Flawed Factual and Legal Arguments ........................ 45

D.     Even If a Reasonableness Test Applies to the Analysis of the RSUAs, the District Court Applied the Wrong Version of the Test ..................................... 48

II.     The Court Should Reverse the District Court's Order Granting Summary Judgment to Rutledge on Count II and Remand for Further Proceedings .................................. 50

A.     The RCA Non-Competes Are Not Legally Unenforceable Restraints on Trade............................ 50

B.     The Conclusions Drawn by the District Court In the MSJ Order As To the RCAs Are Not Supported by the Factual Record or the Law............................... 62

C.     The District Court Erred in Declining to Modify Any Overly Broad Provision in the RCA Non-Competes ................................................................... 64

III.     The Court Should Reverse the District Court's Order Dismissing LKQ's Claim for Unjust Enrichment................ 66

CONCLUSION ................................................................... 70

CERTIFICATE OF COMPLIANCE........................................ 71

CERTIFICATE OF FILING AND SERVICE ......................... 72

CIRCUIT RULE 30(d) STATEMENT..................................... 73

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott-Interfast Corp. v. Harkabus*,
 250 Ill. App. 3d 13, 619 N.E.2d 1337 (Ill. App. Ct. 1993) .............. 65

*Act II Jewelry, LLC v. Wooten*,
 318 F. Sup.3d 1073 (N.D. Ill. 2015) ................................................ 54

*Ainslie v. Cantor Fitzgerald*,
 No. 9436-VCZ, 2023 WL 106924
 (Del. Chan. Jan. 4, 2023)............................................. 26, 41, 42, 44

*Aircraft Gear Corp. v. Lentsch*,
 No. 18 C 50244, 2023 WL 2368038
 (N.D. Ill. Mar. 6, 2023) ........................................................... 52, 65

*AnchorBank, FSB v. Hofer*,
 649 F.3d 610 (7th Cir. 2011) ................................................... 32, 69

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ................................................................. 31, 53

*Aprahamian v. HBO & Co.*,
 531 A.2d 1204 (Del. Ch. 1987).......................................................... 44

*Aquila Inv. Grp., LLC v. Hiller*,
 No. 16-CV-2351, 2019 WL 13227324
 (C.D. Ill. May 31, 2019) ................................................................. 56

*Arpac Corp. v. Murray*,
 589 N.E.2d 640 (Ill. App. Ct. 1992).............................................. 65

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................. 31, 67

*Beard v. Elster*,
 160 A.2d 731 (Del. 1960) ............................................................... 35

*Bell Atlantic Corp. v. Twombly*,
　　550 U.S. 544 (2007) ...................................................................... 66

*Birch Rea Partners, Inc. v. Regent Bank*,
　　27 F.4th 1245 (7th Cir. 2022) ................................................ 31, 51

*Cambridge Eng., Inc. v. Mercury Parts. 90 Bl, Inc.*,
　　879 N.E.2d 512 (Ill. App. Ct. 2007) ............................ 56, 61, 62, 65

*Celotex Corp. v. Catrett*,
　　477 U.S. 317 (1986) ...................................................................... 31

*Cinelli v. American Home Prods. Corp.*,
　　785 F.2d 264 (10th Cir. 1986) ...................................................... 33

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
　　349 F.3d 376 (7th Cir. 2003) ........................................................ 68

*In re Energy Future Holdings Corp.*,
　　842 F.3d 247 (3d Cir. 2016) .......................................................... 43

*In re Fluidmaster, Inc.*,
　　149 F. Sup. 3d 940 (N.D. Ill. 2016) .............................................. 68

*FP UC Holdings, LLC v. Hamilton*,
　　2020 WL 1492783 (Del. Ch. Mar. 27, 2020) ........................... 40, 49

*Hays Grp., Inc. v. Bassick*,
　　No. 02 C 8194, 2005 WL 2420415 (N.D. Ill., Sept. 2009) ............. 61

*Hess v. Kanoski & Assocs.*,
　　668 F.3d 446 (7th Cir. 2012) ........................................................ 67

*Holman v. Indiana*,
　　211 F.3d 399 (7th Cir. 2000) ........................................................ 69

*J.P. Morgan & Co. v. Pierce*,
　　517 F. Sup. 2d 945 (E.D. Mich. 2007) ................................... *passim*

*Kan–Di–Ki, LLC v. Suer*,
  2015 WL 4503210 (Del. Ch. July 22, 2015) .................................. 49

*Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*,
  685 N.E.2d 434 (Ill. App. Ct. 1997)................................................ 55

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  19 CV 7092, 2021 WL 83550 (N.D. Ill. Jan. 30, 2023),
  *aff'd* 8 F.4th 531 (7th Cir. 2021) ................................................... 52

*Lucente v. IBM Corp.*,
  75 F. Sup. 2d 169 (S.D.N.Y. 1999) ................................................ 33

*Medix Staffing Solutions, Inc, v. Dumrauf*,
  2018 WL 1859039 (N.D. Ill. April 17, 2018) ................................ 61

*Mickey's Linen v. Fischer*,
  No. 17 C 2154, 2017 WL 3970595
  (N.D. Ill. Sept. 8, 2017)....................................................... 58, 59, 60

*Midwest Tel., Inc. v. Oloffson*,
  699 N.E.2d 230 (Ill. App. Ct. 1998)......................................... 57, 58

*Milliard Maint. Serv. Co. v. Bernero*,
  566 N.E.2d 379 (Ill. App. Ct. 1997)............................................... 58

*O'Leary v. Telecom Res. Serv.*
  C.A. No. 10C-03-108-JOH
  (Del. Super. Ct. Jan. 4, 2011)................................................... 48, 49

*Pharm. Corp. of Am. v. Askari*,
  C. A. No. 16-1123-RGA-MPT, 2018 WL 2108200
  (D. Del. May 7, 2018)..................................................................... 32

*Prairie Eye. Ctr., Ltd. v. Butler*,
  768 N.E.2d 414 (Ill. App. Ct. 2002)............................................... 57

*Press Ganey Assocs., Inc. v. Dye*,
  No. 3:12-CV-437-CAN, 2014 WL 1116890
  (N.D. Ind. Mar. 19, 2014) ....................................................... 38, 39

*Reliable Fire Equipment Co. v. Arredondo*,
　　965 N.E.2d 393 (Ill. 2011) ........................................... 29, 51, 52, 54

*Richards v. PAR, Inc.*,
　　954 F.3d 965 (7th Cir. 2020) ....................................................... 31

*Sabre Indus., Inc. Waller Waller v. Sabre Indus., Inc.*,
　　No. 18-CV-2111, 2021 WL 6129000
　　(C.D. Ill. Aug. 13, 2021) ................................................................ 55

*Sarah Bush Lincoln Health Ctr. v. Perket*,
　　605 N.E.2d 613 (4th Dist. 1992) .................................................... 60

*State Farm Mut. Auto. Ins. Co. v. Pate*,
　　275 F.3d 666 (7th Cir. 2001) ......................................................... 43

*State v. Phillips*,
　　Del.Ch., 400 A.2d 299 (1979) ........................................................ 44

*StunFence, Inc. v. Gallagher Sec (USA), Inc.*,
　　2002 WL 1838128 (N.D. Ill. Aug. 12, 2002) ............................. 60, 61

*Tatom v. Ameritech Corp.*,
　　305 F.3d 737 (7th Cir. 2002) ............................................. 33, 39, 43

*Tasktop Techs. U.S. Inc. v. McGowan*,
　　Civ. No. 18-1075-RGA (D. Del. Oct. 11, 2018) .............................. 41

*Tower Oil & Technology Co., Inc. v. Buckley*,
　　425 N.E.2d 1060 (Ill. App. Ct. 1981) ............................................. 63

*W.R. Berkley Corp. v. Dunai*,
　　No. 1:19-cv-01223, 2021 WL 1751347
　　(D. Del., May 4, 2021) ............................................................ *passim*

*W.R. Berkley Corporation v. Hall*,
 No. 03C-12-146WCC, 2005 WL 406348
 (Del. Super. Ct. Feb. 16, 2005) ............................................... *passim*

*Weitekamp v. Lane*,
 620 N.E.2d 454 (Ill. App. Ct. 1993) .............................................. 65

**Statutes**

28 U.S.C. § 1291 ............................................................... 4

28 U.S.C. § 1332 ............................................................... 3

**Rules**

Fed. R. Civ. P. 8(d)(2) .......................................................... 68

Fed. R. Civ. P. 8(d)(3) .......................................................... 68

Fed. R. Civ. P. 8(e)(2) .......................................................... 68

Fed. R. Civ. P. 12(b)(6) ......................................................... 31

Fed. R. Civ. P. 56 ............................................................... 3

Fed. R. Civ. P. 56(a) ........................................................... 31

## INTRODUCTION

The District Court's summary judgment ruling was fatally flawed in two important respects. First, the Court made a fundamental error by treating the Restricted Stock Unit Agreement ("RSU") Defendant Rutledge entered into as a non-compete agreement subject to a reasonableness analysis. To the contrary, Rutledge's RSU Agreement was a contract, plain and simple. LKQ offered the RSU Agreement only to certain "Key Employees" through which they receive privileged access to substantial stock incentive grants in exchange for a promise to return the grants or their value should they unfairly compete for a limited period of nine months after leaving Plaintiff LKQ's employ. Rutledge was not required as a condition of employment to enter into the RSU Agreement and was not prohibited from becoming employed with a competitor after leaving LKQ. Rather, he was simply required to return the stock grants (or their monetary equivalent) should he choose to compete—thus restoring the parties to the status quo ante. This type of agreement— frequently referred to as a "clawback"—is commonplace in the corporate world, is quite different from a non-compete agreement, and should not be subject to the same legal analysis. Nor do the courts across the

country, including the Delaware courts (if Delaware law is fairly construed), treat such agreements as if they are conceptually similar to non-competes. Yet that is precisely what the District Court did, which warrants reversal by this Court.

The District Court's summary judgment ruling below was flawed in another crucial aspect. In granting summary judgment in Rutledge's favor as to the RSU Agreement and the Restrictive Covenant Agreement ("RC"), the District Court engaged in impermissible weighing of disputed evidence, crediting Rutledge's testimony while giving short shrift to the powerful countervailing evidence presented by LKQ in favor of a finding of reasonableness as to both the RSU and the RC Agreements. The Court below appeared to be swayed by Rutledge's appeals to sympathy, referring to Rutledge repeatedly and inaccurately as a mere "middle manager" and straining to find hardship to Rutledge in merely being required to return the substantial additional benefits Rutledge had received in exchange for his limited (but broken) promise not to compete for a period of nine months. Conversely, the Court paid mere lip service to other factors bearing upon the reasonableness analysis, including the very limited temporal and geographic scope of the RC Agreement (nine

months and 75-mile radius of Rutledge's place of employment).  At a minimum, even if the record did not support entry of summary judgment in LKQ's favor—especially as to the RC Agreement—it certainly presented an issue for the jury.  Here, the District Court usurped the jury's role, which is a cardinal violation for a trial court on a Rule 56 motion.

## JURISDICTIONAL STATEMENT

### A.    District Court Jurisdiction

The United States District Court for the Northern District of Illinois, Eastern Division, had jurisdiction over this case under 28 U.S.C. § 1332 because Appellant LKQ Corporation ("LKQ") is a citizen of a different state than Appellee Robert Rutledge ("Rutledge") and the amount in controversy exceeds $75,000, exclusive of interest and costs.

LKQ is incorporated in the State of Delaware and has its principal place of business in Cook County, Illinois, and is therefore a citizen of the State of Delaware and the State of Illinois.  ECF 25, ¶ 2.  Rutledge has resided in the State of Florida since 2013 and is a citizen of the State of Florida.  ECF 10, ¶ 3.  Therefore, there is complete diversity of citizenship.

In Count I of the Complaint, LKQ seeks damages in excess of $75,000 in the form of reimbursement of the proceeds that Rutledge received from the sale of restricted stock granted to him by LKQ.  ECF 25, Count I.

## B.    Appellate Jurisdiction

LKQ appeals from the following:

The District Court's Order of June 13, 2023 [ECF 92] granting Rutledge's summary judgment motion on Counts I, II and IV of the First Amended Complaint ("Complaint") [ECF 25], and denying LKQ Corporation's summary judgment motion on Count I; and

The District Court's Judgment Entry of June 13, 2023 [SA41] granting Rutledge's summary judgment motion on Counts I, II, and IV, and denying LKQ Corporation's summary judgment motion on Count I; and

The District Court's previous Order of May 27, 2022 [SA1-17] dismissing LKQ's claim for unjust enrichment.

The United States Court of Appeals for the Seventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, because the District Court's orders granting and denying cross-motions for summary

judgment and entering judgment on Counts I, II, and IV on June 13, 2013, are final decisions, and final judgment was entered by the District Court on June 13, 2023, disposing of all the claims in this lawsuit.  SA41. The previous May 27, 2022 order granting Rutledge's motion to dismiss Count III for unjust enrichment became final with entry of judgment on June 13, 2023.  SA1-17.

This appeal is from a final judgment in the District Court.  The date of entry of the final judgment appealed from was June 13, 2013.  LKQ timely filed its Notice of Appeal on July 5, 2023.  SA42-43.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court erred in granting Rutledge and denying LKQ summary judgment on Count I of the First Amended Complaint by (a) treating the forfeiture provision in the RSU Agreement tied to a promise not to compete as if it were no different from a standard non-compete agreement subject to a reasonableness analysis; and (b) misapplying the reasonableness analysis in the context of the RSU Agreement at issue here.

2.     Whether the District Court erred in granting summary judgment for Rutledge on Count II of the First Amended Complaint by

finding that the non-competition covenants in the separate RC Agreements were facially unenforceable and failing to apply the totality of the circumstances test mandated by the Illinois Supreme Court.

3.    Whether, in properly applying the totality of the circumstances test, there are genuine disputes of material fact that preclude summary judgment on Count II of the First Amended Complaint.

4.    Whether the District Court erred in granting Rutledge's Motion to Dismiss Count III of the First Amended Complaint for unjust enrichment in contravention of Federal pleading standards which allow a party to plead alternative contractual and quasi-contractual, equitable claims.

## STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

#### 1.    Background Regarding LKQ Corporation

LKQ is a company engaged in the auto salvage business.  ECF 80-2, ¶¶ 3-4.  As part of this business, LKQ is a national supplier of salvage and aftermarket automobile parts and products to mechanical shops, repair shops, and other customers.  *Id.*, ¶ 3; ECF 10, ¶ 8.

Much of LKQ's day-to-day operations are conducted out of its full-service, customer facilities located throughout the United States, such as the facility in Lake City, Florida that Rutledge headed for LKQ. At these facilities, LKQ employees engage in the full scope of the auto salvage and recycling business, including dismantling vehicles, the production of recycled parts, and the sales and distribution of such parts in the relevant market. *Id.*, ¶¶ 7-8.

### 2. Rutledge's Employment As a Plant Manager with LKQ

#### a. Rutledge's Responsibilities as a Key Employee

Rutledge is a former senior management employee of LKQ. Before working for LKQ, Rutledge was employed as a Regional Director for Greenleaf Auto Recyclers ("Greenleaf"). ECF 80-2, ¶ 5. Greenleaf was also an auto recycling company. *Id.* In this capacity, Rutledge was responsible for overseeing the individual plant managers for various facilities. *Id.*

In October 2009, LKQ acquired Greenleaf. ECF 80-2, ¶ 6; ECF 79, ¶ 2, 5. Shortly thereafter in 2009, Rutledge began his employment with LKQ in the position of Plant Manager with respect to an LKQ facility located at 4686 East U.S. Highway, Lake City, Florida 32550 (the "Lake City Facility"). ECF 80-2, ¶ 6.

As the Plant Manager at the Lake City Facility, Rutledge was responsible for a large operation. In 2021-2022, the total employees at Lake City fluctuated between approximately 41 and 52 persons. ECF 80-5, p. 24.[1] At the time of Rutledge's departure from LKQ, the Lake City Facility encompassed 60 acres. *Id.*

Rutledge had broad-based managerial responsibilities for the Lake City Facility. As Plant Manager, Rutledge supervised all of the employees at the facility, including, but not limited to, yard pickers, dismantlers, sales employees, delivery drivers, quality control supervisors, a production manager, and an operations manager. ECF 80-2, ¶¶ 7-9. Rutledge was also responsible for managing the various departments at the Lake City Facility, including production, sales, distribution, administration, safety, and finance. *Id.*, ¶¶ 8-9.

As a practical matter, Rutledge oversaw the full gamut of LKQ's operations in his market. *Id.*, ¶¶ 7-10. This included business development, sales, quality control, and the distribution of parts to customers. *Id.*, ¶ 7-8. Rutledge also helped manage all aspects of human

---

[1] LKQ notes that its individual citations to deposition testimony are to the page in the record that contains the deposition testimony and not to the page in the deposition transcript.

resources at the Lake City Facility, including hiring, terminating, and assigning personnel to tasks as appropriate. *Id.*, ¶¶ 7, 9; ECF 80-5, p. 24.

Additionally, Rutledge was responsible for developing relationships with, and providing services to, LKQ's customers. *Id.*, ¶¶ 7, 8, 10. In that regard, Rutledge interacted directly with LKQ customers, and participated on sales visits to obtain new customers. *Id.*, ¶ 10. Rutledge also had some responsibility for negotiating with certain of LKQ's vendors. *Id.*, ¶ 12.

Rutledge was also responsible for the financial performance of the Lake City Facility, including profit and loss responsibility. *Id.*, ¶¶ 8, 11, 13. Rutledge managed costs, the purchase and installation of plant assets, and the fleet of vehicles that were used by LKQ to deliver parts. *Id.*, ¶ 11. He established budget projections for his facility. *Id.* Indeed, his annual bonus was based, in part, on the profitability of LKQ's operations at the plant level. ECF 80-5, pp. 20-21.

### b. Rutledge's Compensation and Stock Grants

As of the date of Rutledge's voluntary resignation from the Company, he was paid a salary of $109,000 a year. ECF 80-2, ¶ 16. His compensation also included medical, dental, and short-term disability

benefits, eligibility for annual bonuses, and 401(k) benefits. *Id.* Wholly apart from his employment compensation, as a Key Employee of the Company, Rutledge was also eligible for, and received, substantial equity in LKQ in the form of restricted stock grants, as detailed in Section A(4) below.

### 3.    Rutledge's Access and Use of LKQ's Confidential and Competitively Sensitive Business Information

It is also undisputed that Rutledge had access to LKQ's competitively sensitive financial and customer data. For example, Rutledge reviewed reports with daily sales and revenue information for the Lake City Facility. ECF 80-2, ¶ 14; ECF 80-5, p. 23. Rutledge also had access to and reviewed reports containing LKQ's revenue, inventory, profitability and margins, and customer sales volume for the Lake City Facility. ECF 80-2, ¶ 14. Rutledge further testified that managers from other LKQ facilities across the country sometimes shared their financial reports with him. *Id.*, ¶¶ 14-15.

Rutledge also accessed a wide array of valuable information relating to LKQ's customers, pricing, and customer relationships. In his Plant Manager role, Rutledge had access to customer contact

information.  *Id.*  He had access to customer pricing and sales figures.  *Id.*  From time to time, Rutledge received information relating to customer discount (rebate) programs that were implemented by LKQ.  *Id.*  As a practical matter, there is no way that Rutledge could have prepared operating budgets or managed costs and profitability for the Lake City Facility without routine and comprehensive access to LKQ's competitive position and sensitive business information.

### 4.  LKQ Designates Rutledge As a Key Employee Eligible to Receive Substantial Grants of LKQ Restricted Stock.

To better align its interests with the interests of its senior managerial employees, LKQ enters into agreements with its key management employees under which they receive equity in the company in the form of LKQ restricted stock (referred to generally as the "RSU Program").  LKQ designates less than 2% of its aggregate workforce as "key employees" eligible to partake in the RSU Program.  ECF 82-1; LKQ's Answer to Interrogatory No. 6.  With respect to the operations group, the RSU Program is generally limited to key employees in such positions as General Manager, Plant Manager, District Manager, Regional Vice President, and positions above the Regional Vice President level.  *Id.*

An employee's participation in the RSU Program is not mandatory and an employee may elect not to participate without any repercussions for their employment. ECF 80-2, ¶ 21. Generally, under the terms of the RSU Program, key management employees enter into an agreement with LKQ for the vesting of shares of LKQ restricted stock during their employment. *Id.*, ¶¶ 19, 21. Once the shares have vested, the employee is free to dispose of his or her shares of LKQ stock on the open market. *Id.* In exchange for this financial benefit and equity stake in the Company, the Restricted Stock Unit Agreements ("RSUAs") are not conditioned upon anything except abiding by the terms of the RSUAs. *Id.*; ECF 80-2, ¶ 20.

Rutledge entered into RSUAs with LKQ in each of the years 2013-2020. *Id.*, ¶¶ 19, 21, 22. Each year, Rutledge would receive an allotment of shares of LKQ stock based on a vesting schedule, whereby 10% of the stocks vested every six months. *Id.*

The stock grants were conferred upon Rutledge each year that he entered into the RSUAs. Rutledge does not dispute that he received the RSU grant packages for the years 2013-2020 and does not dispute that he received the RSU Agreement each year from 2013 through 2020. *Id.*

Rutledge likewise does not dispute that he entered into the 2013-2020 RSUAs with LKQ and that the parties mutually performed under the RSUAs through the vesting of restricted stock. *Id.*, ¶ 29-31.

Indeed, Rutledge profited handsomely from this arrangement. Rutledge received a total of 11,414 shares of LKQ restricted stock with a market value of $317,507. *Id.*, ¶ 31. Rutledge sold all of the vested restricted stock units that were granted to him. *Id.*

### 5.    Rutledge's Contractual Obligations to LKQ

Under the RSUAs he signed each year, Rutledge agreed, in pertinent part, to the following non-competition covenant:

> 16.    Non-Competition and Confidentiality…
>
> (a)(i) the Key Person shall not directly or indirectly (1) be employed by, engage or have any interest in any business which is or becomes competitive with the Company or its subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of the Company or its subsidiaries… provided, however, that this restriction shall not prevent the Key Person from acquiring and holding up to two percent of the outstanding shares of capital stock of any corporation which is or becomes competitive with the Company or is or becomes otherwise prejudicial to or in conflict with the interests of the Company if such shares are available to the general public on a national securities exchange or in the over-the-counter market…

*See Id.*, ¶¶ 23-24 (the 2013-2015 and 2016-2020 RSUAs contain substantially similar language relating to the non-competition restriction).

In the RSUAs, LKQ and Rutledge also agreed that, if the "Key Person" is not in compliance with the restrictive covenants set forth in the respective RSUAs for a period of only nine months following Rutledge's separation of employment, then Rutledge agreed to forfeit the proceeds from the restricted stock:

> …the RSUs, the shares of common stock of the Company underlying the RSUs, or any proceeds received by the Key Person upon the sale of shares of common stock of the Company underlying the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the date of this Agreement and ending nine months following the termination of the Key Person's affiliation with the Company and/or its subsidiaries…

*See Id.*, ¶¶ 25-26 (the 2013-2015 RSUAs and the 2016-2020 RSUAs contain substantially similar language).

Further, the parties agreed to the following provisions governing the forfeiture and/or repayment of the restricted stock units under the RSUAs as follows:

> The forfeiture shall be effective as of the date of the occurrence of any of the activities set forth in Section 16(a) above. If the Shares underlying the RSUs have been sold, the Key Person shall promptly pay to the Company the amount of the proceeds from such sale.

*See Id.*, ¶¶ 25-26 (the 2013-2015 RSUAs and the 2016-2020 RSUAs contain substantially similar language).

Rutledge also signed "Confidentiality, Non-Competition, and Non-Solicitation Agreement[s]" every year from 2011 to 2020 (these are referred to collectively as the "RCAs"). ECF 79, ¶ 14. The non-competition covenant in the RCAs prohibits Rutledge from "caus[ing], engag[ing] in, represent[ing], furnish[ing] consulting services to, be[ing] employed by or hav[ing] any interest in . . . any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" within 75 miles of any LKQ facility where Rutledge worked and for a period of 9 months following the termination of his employment with LKQ (referred to as the "RCA Non-Compete"). *See, e.g.,* 2020 RC Agreement at *Id*.

The RC Agreements further stated:

> Employee desires to receive a grant of an equity incentive award from Employer . . . and desires to be employed by (or to continue employment with)

15

> Employer . . . in a position in which Employee may receive from Employer or develop for Employer information that Employer desires to keep secret and confidential.

*See, e.g.,* 2020 RC Agreement at *Id.*

LKQ's District Manager, Robert Six, to whom Rutledge reported, testified that, through these agreements, LKQ seeks to protect "customer pricing, customer discounts, customer contact information…vendor and supplier pricing, any potential rebates…financial information, revenue, margin data, expense data, profitability data…[and] any marketing strategies for Rutledge's market." ECF 79-2, p. 27; Six Deposition, p. 98.

### 6. Rutledge Voluntarily Resigns His Employment with LKQ to Work for LKQ's Direct Competitor

In April of 2021, Rutledge voluntarily resigned his employment with LKQ to work for Fenix Parts. There is no dispute that LKQ and Fenix Parts are direct competitors in the auto recycling and salvage business. ECF 80-2, ¶¶ 33-35. Like LKQ, Fenix Parts is also a national recycler and reseller of recycled and salvaged automotive parts and products. *Id.*, ¶¶ 33-36. Both LKQ and Fenix Parts compete for the same customers through the sale of recycled automotive parts to body shops, automotive dealerships, mechanical shops, and retail customers. *Id.*, ¶ 37.

Fenix Parts also competes with LKQ in various states throughout the country. As of July 21, 2022, Fenix Parts operated out of 24 customer service locations throughout the country, including in the States of Florida, Texas, North Carolina, New York, New Jersey, Pennsylvania, and Massachusetts. *Id.*, ¶ 39. This includes three separate customer service facilities in the State of Florida, where Rutledge was previously employed with LKQ. *Id.*, ¶ 40. As a direct acknowledgement of the value of confidential business information and customer relationships in the auto recycling business, Fenix Parts, too, enters into Confidentiality, Non-Disclosure, and Non-Solicitation Agreements with certain of its employees, including Rutledge. *Id.*, ¶ 41.

On March 23, 2021, Rutledge signed an offer letter from Fenix Parts for the position of Vice President of Capital Projects. *Id.*, ¶ 43. By email dated March 22, 2021, Rutledge stated that he anticipated a starting date with Fenix Parts on April 19. ECF 80-6, p. 45. On March 25, 2021, and despite his ongoing employment with LKQ, Rutledge entered into a Confidentiality, Non-Disclosure, and Non-Solicitation Agreement with Fenix Parts. ECF 80-2, ¶¶ 44, 46.

Rutledge voluntarily resigned his employment with LKQ on March 23, 2021, effective April 14. *Id.*, ¶ 44. Between March 23 and April 14, Rutledge did not inform LKQ that he had accepted employment with Fenix Parts. *Id.* Rather, when asked by District Manager Robert Six about his post-LKQ plans, Rutledge lied and stated that he was going to take some time off and think about his life. *Id.*

LKQ soon learned of this lie when Rutledge commenced employment with Fenix Parts in April of 2021. That same month, LKQ was alerted to a Facebook post showing Rutledge's presence at a Fenix Parts facility in the State of Florida. ECF 79-2, p. 5. The exact title and nature of Rutledge's initial position with Fenix Parts has been the subject of shifting explanations from Rutledge and Fenix Parts. Rutledge testified that he initially held the position of VP of Capital Procurement and Projects. ECF 80-5, pp. 81, 85-87, 90-91. The signed offer letter from Fenix Parts states that Rutledge would hold the position of Vice President of Capital Projects. ECF 86-2, pp. 81-82; ECF 80-5, p. 136. Rutledge posted on his LinkedIn profile that he held the position of VP of Special Projects. *Id.* As set forth in an affidavit signed by Paul Delaney, the Chief Operating Officer of Fenix Parts, Fenix Parts employed

18

Rutledge in the position of VP of Capital Procurement. ECF 80-5, p. 136. Fenix Parts' Vice President of Operations Bill Stevens testified that Rutledge's role was the VP of Capital Projects.[2] ECF 80-20, pp. 83-84.

In his new position of Vice President, Rutledge reported directly to the Chief Operating Officer of Fenix Parts. ECF 80-2, ¶ 45. In this capacity, Rutledge was purportedly responsible for overseeing capital assets. *Id.*, ¶ 48. This involved the purchase, maintenance, construction, and reporting for the fleet and field assets for certain facilities. *Id.* Rutledge also developed transportation distribution procedures for Fenix Parts products. *Id.* Rutledge further engaged in the management of construction projects for Fenix Parts' facilities, which involved buying equipment, interacting with vendors, and negotiating pricing relating to purchases. *Id.* Rutledge's duties also included making purchases from vendors relating to trucks and long-term assets relating to capital projects. *Id.*

Notably, Rutledge testified that, in his position as a Plant Manager for LKQ, he also had responsibilities for capital procurement and projects

---

[2] LKQ will refer to this role as "Vice President" for the remainder of the brief given the shifting titles ascribed to it by Rutledge and Fenix Parts.

relating to the Lake City Facility.  *Id.*, ¶ 49.  Rutledge's purported job duties as Vice President dovetailed with many of his responsibilities as a Plant Manager for LKQ.  Rutledge testified that he had responsibility relating to distribution, the purchase of capital and plant assets, and negotiating and approving of vendor expenses as a Plant Manager for LKQ.  *Id.*, ¶¶ 8-9, 11, 49.

In his position as Vice President for Fenix Parts, Rutledge worked with Fenix Parts' facilities in Florida, New Jersey, Pennsylvania, Texas, Houston, and North Carolina.  *Id.*, ¶ 50.  After becoming employed by Fenix Parts, Rutledge worked part of the time from his Florida home office and testified that the time he spent working from home or on the road was close to "50/50".  *Id.*, ¶ 51.  Notably, the home office from which Rutledge worked for Fenix Parts was within 75 miles of the Lake City Facility he managed for LKQ.  *Id.*, ¶ 52.  Fenix Parts competes directly with LKQ in the Lake City, Florida market.  *Id.*, ¶ 38; ECF 80-2, p. 49.

Based on a review of Rutledge's phone records produced in discovery, Rutledge admitted that he contacted multiple LKQ customers after his departure from LKQ and while he held the position of Vice President for Fenix Parts.  ECF 79-1, pp. 18-19.  In this testimony

Rutledge contended that he contacted these customers for reasons purportedly unrelated to his employment for Fenix Parts. *Id.*

No Fenix Parts employee has held the job title of Vice President of Capital Procurement and Projects or any similar title after Rutledge departed from the position—conveniently after the nine-month LKQ restriction expired. ECF, 80-2, ¶ 53. Rather, it appears the position was a façade created by Fenix and Rutledge to try and avoid running afoul of his obligations to LKQ.

### 7. Rutledge Becomes a Southeast Area Manager for Fenix Parts, Overseeing Multiple Fenix Parts Facilities

Beginning in April of 2022, Rutledge held the position of Southeast Area Manager for Fenix Parts. ECF, 80-2, ¶ 54. In this position, Rutledge has managed facilities in Greensboro and Forest City, North Carolina, as well as Pensacola and Auburndale, Florida. *Id.*, ¶ 55.

As Southeast Area Manager for Fenix Parts, Rutledge supervises four General Managers for these facilities. *Id.*, ¶ 55. The position of General Manager for a Fenix Parts facility is the equivalent of a Plant Manager for a LKQ facility—i.e., Rutledge's old role at LKQ. *Id.*

Rutledge further testified that the local General Managers he supervises have oversight over sales employees. ECF 79-1, p. 28. Rutledge receives financial reports relating to sales for his facilities. *Id.*, pp. 28-29. Rutledge has participated on calls and strategy relating to a sales blitz and plans to communicate with Fenix Parts' customers. *Id.*, p. 27. Rutledge has access to Fenix Parts' reports for the entire Southeast Region of the United States. *Id.*

In this position, Rutledge has responsibilities relating to profit and loss, plant costs, plant expenditures, and input relating to hiring decisions. ECF 80-2, ¶ 57. Rutledge speaks with Jason Cox, his supervisor and the co-leader for Fenix Parts' Southeast Region, approximately four times a week. *Id.*, ¶ 58.

## B.  COURSE OF PROCEEDINGS AND DISPOSITION BELOW

### 1.  LKQ's Filing of the Lawsuit and Amendment of Pleadings

On June 4, 2021, LKQ filed its initial Complaint in this lawsuit. ECF 1. On July 27, 2021, Rutledge filed his Answer to the Complaint as well as his Counterclaim asserting three different counts against LKQ: (Count I) Declaratory Judgment; (Count II) claims for unpaid wages

arising out of the RSUAs; and (Count III) a claim for tortious interference. ECF 10. After LKQ filed a Motion to Dismiss the Counterclaims, the District Court entered an Order on May 27, 2022, dismissing Rutledge's claims for declaratory judgment and for tortious interference. SA1-17. That order is not at issue in this appeal.

On January 4, 2022, LKQ filed its First Amended Complaint ("FAC"). ECF 25. In the FAC, LKQ asserted three counts against Rutledge: Count I for breach of contract in violation of the RSUAs; Count II for breach of contract in violation of the RCAs; and Count III for unjust enrichment based on Rutledge's inequitable retention of the monetary benefits he received in the form of LKQ restricted stock. *Id.*; *see* Counts I, II, and III.

## 2. District Court Ruling on Rutledge's Motion to Dismiss

On January 18, 2022, Rutledge moved to dismiss Counts I, II and III of the First Amended Complaint ("Motion to Dismiss"). ECF 28. On May 27, 2022, the District Court entered a Memorandum Opinion and Order ("MTD Order") granting Rutledge's Motion to Dismiss in part and denying in part. SA1-17. While the District Court denied Rutledge's Motion to Dismiss with respect to Counts I and II of the

FAC,[3] it granted Rutledge's Motion to Dismiss with respect to Count III, or the claim for unjust enrichment. *Id.* In so holding, the Court found that, in Illinois, recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and the defendant. *Id.*, p. 11. The District Court further held that the allegations of an express contract in the FAC were inconsistent with a quasi-contractual claim for unjust enrichment and dismissed the claim. MTD Order, pp. 11-13.[4]

### 3. District Court Ruling on Cross Motions for Summary Judgment

On January 20, 2023, the parties filed cross motions for summary judgment. LKQ moved for summary judgment on Count I of the FAC for breach of the RSUAs and on Rutledge's Counterclaim relating to unpaid

---

[3] Interestingly, in denying Rutledge's Motion to Dismiss LKQ's contractual Counts, Judge Durkin took special note of the reasonableness of the nine-month temporal restriction and 75-mile geographic radius. *Id.*, pp. 7 and 10.

[4] Of course, the District Court later held at the summary judgment stage (discussed immediately below) that LKQ's express contracts were unenforceable, thus effectively leaving LKQ without any remedy for Rutledge's decision to accept the substantial benefits of the RSUs while refusing to comply with the restriction on unfair competition. This result is both legally untenable and inequitable, as discussed in the Legal Argument, Section III below.

wages.  ECF 80.  Rutledge moved for summary judgment as to Counts I, II, and IV of the FAC for breach of the RSUAs and for breach of the RCAs. ECF 77-79.

On June 13, 2023, the District Court entered a Memorandum Opinion and Order on the cross-motions for summary judgment ("MSJ Order").  SA18-40.  In the MSJ Order, the District Court granted Rutledge's summary judgment motion on Counts I, II and IV of the FAC. The Court denied LKQ's summary judgment motion on Count I of the FAC, but granted LKQ's motion with respect to Rutledge's remaining Counterclaim for unpaid wages, thereby disposing of all the claims in the case.[5] *Id.*  The District Court subsequently entered judgment on June 13, 2023.  SA41.

With respect to Count I of the FAC, the District Court found that the RSUA Non-Competes were overbroad and legally unenforceable under Delaware law.  In reaching its holding, the District Court rejected LKQ's legal authority on the distinction between a forfeiture provision in a stock equity agreement and the analysis that applies to traditional

---

[5] Rutledge has not appealed the ruling on his Counterclaim for unpaid wages.

restrictive covenants.  MSJ Order, p. 7-8, 12-13.[6]  Instead, the Court

applied a generalized "reasonableness" analysis to invalidate the

covenants—treating the RSUAs as if they were ordinary non-compete

agreements.  *Id.*  After concluding that Rutledge's six figure stock grants

resulted in a "moderate" financial benefit to Rutledge, the District Court

likened the forfeiture clause to a liquidated damages provision.  *Id.*, p. 9.

Again, however, the District Court dismissed LKQ's authority that such

forfeiture provisions are not liquidated damages under Delaware law.

*Id.*, pp. 10-11.  The District Court further minimized LKQ's legally

protectable interest in enforcing the agreements, finding that it was

limited to vendor and supplier relationships (despite record evidence to

the contrary) and that the record did not reflect any loss to LKQ from

Rutledge (whom the Court repeatedly referred to as a "middle manager")

working for a direct competitor in a position with overlapping

responsibilities.  *Id.*, p. 10.

---

[6] The District Court relied heavily upon a single Delaware intermediate appeal court decision, *Ainslie v. Cantor Fitzgerald*, No. 9436-VCZ, 2023 WL 106924 (Del. Chan. Jan. 4, 2023). For the reasons discussed in the Argument Section I.B below, the District Court's reliance upon *Ainslie* was misplaced.

In reaching its decision on Count II, the District Court found that the RCA Non-Competes were overly broad and unenforceable under Illinois law. *Id.*, p. 11-18. Overlooking the substantial consideration Rutledge received for entering into a narrow, 9-month and 75-mile radius non-compete, and much of the factual record regarding Rutledge's position with LKQ, access to LKQ's valuable and commercially sensitive information, and the unfair competitive threat posed by Rutledge's immediate employment in a high level position with a direct competitor, the Court found that LKQ did not have a legally protectable interest in the protection of its vendor and supplier relationships and that the RCA Non-Competes represented an impermissibly broad ban on employment. *Id.*[7] In reaching this conclusion, the Court relied upon a highly selective account of the record evidence and did not apply the totality of

---

[7] The District Court placed great credence in Rutledge's facial overbreadth argument even though in the procedural posture of the case on summary judgment it was apparent that Rutledge—a designated Key Employee of LKQ—was being hired for a highly responsible role at Fenix Parts. He was not being hired as a janitor. The District Court placed further credence in Rutledge's argument that there was no "direct evidence" that he had solicited LKQ customers and/or absconded with LKQ's confidential information—claims that LKQ was not pursuing— and ignoring the evidence of Rutledge's lack of credibility on these points. *Id.*, p. 9-11.

circumstances test mandated by controlling Illinois Supreme Court precedent. Had the District Court applied such controlling test, there was at least a fact issue for the jury as to LKQ's claims under Count II.

## SUMMARY OF THE ARGUMENT

The Court should reverse the District Court's Order granting summary judgment to Rutledge on Count I of the FAC and enter summary judgment for LKQ as to the RSUAs. The District Court committed a fundamental analytical error right at the threshold by treating the RSUAs as ordinary employment-based restrictive covenants subject to a reasonableness analysis. They are not. Rather, the RSUAs merely provide that should Rutledge choose to compete against LKQ, he must return the substantial proceeds from the stock equity grants he received in exchange for such promise. This issue should have been analyzed under traditional contract law principles, rather than as a restraint of trade subject to stricter scrutiny. The law of Delaware chosen by the parties amply supports this conclusion, as do persuasive authorities from other jurisdictions across the country. The District Court's contrary conclusion rests upon a misreading of the RSUAs and a misreading of Delaware precedent.

The Court should also reverse the District Court's Order granting summary judgment to Rutledge on Count II of the FAC and remand for further proceedings on that Count. In finding the RCAs overly broad and unenforceable, the District Court misapplied the Illinois Supreme Court's holding in *Reliable Fire Equipment Co. v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2011).[8]  *Reliable Fire* mandates that courts apply a reasonableness test based on the totality of the circumstances of each case. A review of the full record reveals that the 9-month, 75-mile restrictions in the RCA Non-Competes are narrowly tailored and enforceable. The District Court failed to properly take into account the record evidence relating to LKQ's legally protectable interests, the competitive threat posed by Rutledge's employment with LKQ's direct competitor, and the substantial monetary consideration that Rutledge received for entering into these agreements. At other times, the District Court relied upon cherry picked evidence cited by Rutledge and ignored other evidence that was supportive of LKQ's position on enforceability of the RCAs. Put simply, the District Court placed its thumb on the scale

---

[8] LKQ notes that the District Court applied Illinois law to the review of the RCAs based on the Illinois choice of law provision set forth in these agreements. *See* MTD Order, p. 9.

for Rutledge, making credibility determinations and weighing evidence in a manner legally inappropriate at summary judgment.

Finally, this Court should reverse the District Court's dismissal of Count III of the FAC for unjust enrichment. A review of the allegations in the FAC reveals that LKQ adequately pled the requisite elements of this claim. Federal pleading standards allow for the pleading of alternative counts for contractual and quasi-contractual, equitable claims. Given the District Court's subsequent refusal to enforce LKQ's contractual claims, the dismissal of the unjust enrichment count left LKQ without a remedy for Rutledge's clearly inequitable conduct. At a minimum, even if LKQ's contractual claims cannot proceed, which they should, the equitable claim for unjust enrichment is adequately pled and should be allowed to stand.

# ARGUMENT

## *Standard of Review*

Summary judgment is inappropriate when a genuine dispute of material fact exists. Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there is no such dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This Court reviews a grant of summary judgment *de novo*, construing the evidence and granting all reasonable inferences in favor of the nonmovant. *Richards v. PAR, Inc.*, 954 F.3d 965, 967 (7th Cir. 2020). A genuine issue of material fact exists only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Birch Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). At summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In ruling on a Rule 12(b)(6) Motion to Dismiss, the Court must determine whether a complaint states sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts as true all well-pleaded facts in the

plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011).

### *Discussion*

**I.    The Court Should Reverse the District Court's Order Granting Summary Judgment to Rutledge on Count I of the Complaint and Denying Summary Judgment for LKQ.**

    **A.    The RSUAs Are Valid and Enforceable Forfeiture Agreements Analytically Distinct From Non-Compete Agreements.**

To state a claim for breach of contract, LKQ must establish: (1) the existence of a valid and enforceable contract; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff. *See Pharm. Corp. of Am. v. Askari*, C. A. No. 16-1123-RGA-MPT, 2018 WL 2108200, at \*5 (D. Del. May 7, 2018). At summary judgment, the District Court's focus was on the first element, as it concluded that the RSUAs are overly broad and legally unenforceable under Delaware law.[9] This holding is manifestly incorrect and

---

[9] Each of the RSUAs have a choice-of-law provision requiring the application of Delaware law. The District Court held that Delaware law applies to the analysis of the RSUA contractual provisions consistent with the parties' choice of law in the RSUAs. For that reason, LKQ's appeal from the ruling as to the RSUAs will focus upon Delaware law, although other authorities will be discussed as well to the extent their

constitutes reversible error with respect to Count II for breach of the RSUAs.

The RSUAs are valid and enforceable contracts. As a threshold matter, the forfeiture provisions at issue in the RSUAs are not traditional "restrictive covenants." An employee's promise not to engage in post-employment, competitive conduct that results in the forfeiture of monetary benefits is analytically distinct from "restrictive covenants." *See, e.g., Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002) ("Federal cases draw a distinction between provisions that prevent an employee from working for a competitor and those that call for a forfeiture of certain benefits should [s]he do so."); *Lucente v. IBM Corp.*, 75 F. Sup. 2d 169, 172 (S.D.N.Y. 1999) ("[A]n employee who receives benefits conditioned on not competing with the conferring employer has the choice of retaining his benefits by refraining from competition or risking forfeiture of such benefits by exercising his right to compete."); *Cinelli v. American Home Prods. Corp.,* 785 F.2d 264, 266 (10th Cir. 1986) (drawing a distinction between contract provisions which restrain

---

reasoning is pertinent to a proper understanding of the issues relating to the RSUAs.

competition and provisions which merely work a forfeiture of economic advantage). Here, too, Rutledge's RSUA—which he entered into voluntarily—did not forbid him from competing. He was free to compete with LKQ after his departure, provided that he returned the generous equity grants he received in exchange for an expectation of his purported alignment with the Company's interests and commitment to its success as a "Key Employee" of the Company.

Delaware law amply supports the same conclusion. In *W.R. Berkley Corp. v. Dunai*, No. 1:19-cv-01223, 2021 WL 1751347 (D. Del., May 4, 2021), the defendant was a Vice President who received more than $200,000 in stock pursuant to a stock benefit plan from her prior company, which provided that the employee had to forfeit the stock or repay the granted value if she engaged in "competitive action" against the company within a year of termination. *Id.*, at *2. After resigning her employment, the defendant took a position with a rival company. *Id.* As articulated by the court in *Dunai*: "[Plaintiff's] employer gave her a generous bonus – with a catch. *Id.*, at *1. Now she says the catch was unreasonable. It was not." The court further held:

> W. R. Berkley granted Dunai—a corporate vice president—tremendous benefits. To make sure

that was not for naught, it imposed a reasonable restriction on its grants: if Dunai competed against the company *within* one year of termination—an action the parties agreed "would result in irreparable injuries to [W. R. Berkley] and would cause loss in an amount that cannot be readily quantified," D.I. 1-1 at 4—she had to forfeit the stock or repay the granted value. Indeed, Dunai would never be worse off than she would have been before the agreements.

*Id.*, at *3-4.

Indeed, the court in *Dunai* found: "Though Dunai improperly classifies her contract provision as a 'noncompete,' it is actually a clawback. She was free to work for a competitor right away. The only condition was, if she did so within one year, she had to repay the stock grants that the company had given her." *Id.* at *2.  The Court went on to stress that Delaware courts actually favor this type of provision:

> Dunai asks me to… declar[e] the contract "not enforceable under ... Delaware law."  But I find this contract reasonable. Indeed, Delaware law often *favors* this type of clawback provision. For decades, Delaware courts have required stock grants to include conditions ensuring that the grants do not constitute waste or a gift of corporate assets. *Beard v. Elster*, 160 A.2d 731, 735–36 (Del. 1960). The corporation must "reasonably expect to receive the contemplated benefit from the grant of options." *Id.* at 737.

*Id.* at *2.

35

Finally, the *Dunai* court squarely rejected the argument—mistakenly accepted by the District Court below—that the claw back provision constituted unlawful liquidated damages:

> While Dunai claims that the penalty is untethered from any damages W. R. Berkley incurred, D.I. 27 at 18, that argument misunderstands the nature of her agreement. This is not a $200,000 penalty for working for a competitor; it is returning a supplemental benefit for breaching the terms of a bargain. That is not a liquidated-damages provision.

*Id.* at *2. In short, the *Dunai* court demolished the flawed logic underlying the District Court's conclusion that the forfeiture provision at issue in this case constituted liquidated damages.

In *W.R. Berkley Corporation v. Hall,* No. 03C-12-146WCC, 2005 WL 406348, *2 (Del. Super. Ct. Feb. 16, 2005), the employer "adopted an incentive stock option plan as a reward and incentive to its employees." *Id.* The relevant Incentive Stock Option Agreement provided that the employee could purchase stock in the employer's holding company at a significant discount. *Id.* at **2-4. The stock option agreement executed by the employee contained a provision which allowed the company to seek reimbursement of the difference between the option price and the stock price if an individual left their employment within six months of

execution of the option if the employee "directly or indirectly ... (i) ... engages in any business activities which are competitive, to a material extent, with any substantial type or kind of business activities conducted by W.R. Berkley Corporation." *Hall,* 2005 WL 406348, *2. Despite the agreement, the employee nevertheless left his employment three months later to work for a competitor. *Id.* Similar to Rutledge here, the defendant in *Hall* argued that the "payback provisions of the agreement are simply a non-compete liquidated damage provision that is an unenforceable penalty." *Id.* The Delaware Superior Court rejected this argument stating:

> Finally, the Court is unpersuaded by the Defendant's liquidated damage argument. Counsel may put whatever spin they want on this provision, but to the Court it is simply a contractual obligation that requires a senior management employee to remain with the company for six months if he wants to retain the full benefit of the stock option. If he does so, the financial savings he realized with the purchase of the stock is his to keep regardless of his future employment. On the other hand, if he leaves before the end of the six-month period, he must pay the market price of the stock. He knew of this obligation and simply now is asking the Court to free him of this responsibility. The Defendant's freedom of employment and his ability to seek or move to a new job was not abridged by the Plaintiff nor were there any limitations on the Defendant to

> seek any job he so desired. All that is being sought
> here is the repayment of the financial benefit
> provided by the Plaintiff to the Defendant when he
> decided to exercise the option to leave according to
> the terms of the option agreement. The Court finds
> that he is simply contractually obligated to do so.

*Id.* at *5.

Here, too, Rutledge's RSUA did not prevent him from working in the auto salvage industry. All the RSUA required of Rutledge is that he return the benefits he received under the RSUA—which was far from a penalty, but rather merely restored the status quo ante. The District Court's ruling to the contrary essentially permits Rutledge to have his cake and eat it too, which is neither lawful nor equitable.

Other precedent supports LKQ's position that forfeiture provisions of this sort should not be viewed through the lens of a standard restrictive covenant agreement. For example, in *J.P. Morgan & Co. v. Pierce*, 517 F. Sup. 2d 945 (E.D. Mich. 2007), a Federal District Court in Michigan (applying Delaware law) enforced a non-competition forfeiture provision in a stock award agreement that provided for reimbursement by the employee from amounts gained through the exercise of stock options after the employee resigned and obtained competitive employment. In *Press Ganey Assocs., Inc. v. Dye*, No. 3:12-CV-437-CAN, 2014 WL 1116890

38

(N.D. Ind. Mar. 19, 2014), the court rejected the defendant's argument that a stock grant agreement conditioned on the defendant not working for a competitor for 12 months was an unenforceable non-compete covenant. *Id.* at **5-7 (also finding Delaware law to be in accord on this point). As this Court has also recognized, "a provision that calls for the forfeiture of a bonus in the form of stock options does not strike us as an unreasonable restraint on competition." *Tatom*, 305 F.3d at 744-45.

Tellingly, in *Hall, Pierce*, and *Dunai* (all applying Delaware law) none of the courts engaged in a "restrictive covenant" reasonableness analysis relating to the geographic, temporal, and substantive scope of the respective competitive restrictions. Instead, all of them analyzed the forfeiture provisions at issue as a matter of basic contract law. The reason is simple: such a forfeiture provision is not a restraint of trade in the sense of a non-compete provision. The recipient of the equity grant, as here, is perfectly free to compete. But they are not permitted to keep the benefits conferred upon them if they are going to do so.

In its MSJ Order, the District Court recognized the factual distinction between the forfeiture provisions in the RSUAs and a restrictive covenant that outright prohibits competitive conduct. "LKQ

is right—the RSUAs do not outright prevent Rutledge from competitive conduct; instead, they state that…LKQ may claw back the proceeds he received from the sale of the RSUs." MSJ Order, p. 8. Yet despite this, the District Court failed to grasp the significance of this distinction for purposes of whether such forfeiture provision is enforceable as a matter of law.

The decisions relied upon by Rutledge and cited by the District Court are inapposite. In *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *5-8 (Del. Ch. Mar. 27, 2020), the non-compete at issue did not involve or relate to the forfeiture of any monetary benefits received by the employee. Unlike the facts in this case, the court in *FP UC Holdings* explicitly noted that "the record evidence here lacks any evidence that Mr. Hamilton received substantial consideration in exchange for his commitment not to work in Fast Pace's industry anywhere in the United States." *See Id.*, 2020 WL 1492783 at *7. Here, LKQ delivered restricted stock units to Rutledge with a value well in excess of $300,000, which was approximately three times his salary with Fenix Parts (or with LKQ) in exchange for his agreement not to work for a competitor for a limited and reasonable nine-month period. Similarly,

in *Tasktop Techs. US Inc.*, 2018 WL 4935870 (D. Del. Oct. 11, 2018), the non-compete at issue did not relate to the forfeiture of any monetary benefits received by the employee, and the employee (who had a base salary of $40,000) was not entitled to any monetary consideration for entering into the non-compete covenant. *Id.*, at *1-2. Thus, the holding in *Tasktop* does not support Rutledge's position.

## B. The Ainsle Decision Does Not Support the Court's Finding on Count I.

In reaching the conclusion that the RSUA Non-Competes were unenforceable, the District Court relied heavily on *Ainsle v. Cantor Fitzgerald, L.P.*, No. 9436-VCZ, 2023 WL 106924 (Del. Ch. Jan. 4, 2023). For the reasons set forth below, the *Ainslie* decision is inapplicable and has no bearing on the enforceability of the RSUA Non-Competes and it certainly does not merit the District Court's conclusion that the RSUA Non-Competes are legally unenforceable as a matter of Delaware law.

*First*, *Ainsle* is factually inapposite. The provisions at issue in *Ainsle* were not a clawback of stock grants already conferred upon the recipient, subject to a condition that the recipient not unfairly compete. Rather, in *Ainslie* the provision at issue related to the withholding of future payments otherwise owed to a partner from the partner's capital

account.  *Id.*, *1.  The partnership agreement provided, *inter alia*, that the partnership would remit payment to the partner of one fourth of the funds per year, unless the partner engaged in certain "competitive activities" within one to two years following the partner's departure from the firm.  *Id.*  Thus, the non-competition "forfeiture" provisions were a contractual condition precedent (referred to by the *Ainsle* court as "the Competitive Activity Condition") to the payment of future compensation owing after the partner left the firm and over the course of a four-year period.  *Id.*, at **1-2, 5-6, 20-25.   Here, by contrast, LKQ merely seeks to restore the *status quo ante* with respect to RSUs that were already granted to Rutledge in consideration of his contractual promises in the RSUAs.  As articulated by the Court in *Hall*, Rutledge "would never be worse off than he would have been before the agreements."  *Hall,* 2005 WL 406348, *2.

*Second*, *Ainsle* did not involve the forfeiture of proceeds arising from a stock equity agreement such as the RSUAs.  Such agreements are treated differently under Delaware law.  As reflected in the authority cited *supra*, Delaware courts have allowed stock grants to include conditions ensuring that the grants do not constitute waste or a gift of

corporate assets.  *See Pierce*, 517 F. Sup. 2d at 967-68.  A corporation can reasonably expect to receive a benefit from a managerial employee in the form of a non-competition restriction in exchange for the grant of stock. *Id.*  Along these lines, the courts in *Hall, Pierce*, *Dunai*, and *Tatom* held that the forfeiture of benefits based on a violation of non-competition restrictions is a reasonable contemplated benefit under a stock equity agreement and not, as the District Court held, an invalid restraint of trade.

*Third*, a federal court sitting in diversity is bound to follow state law under *Erie* as announced by the highest state court as if the issue were presented before such tribunal.  *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001).  "[I]f that state's highest court has not provided guidance, [the Court] is charged with predicting how that court would resolve the issue."  *In re Energy Future Holdings Corp.*, 842 F.3d 247, 253–54 (3d Cir. 2016).

Here, *Ainsle* is a decision by the Delaware Chancery Court, an intermediate Delaware appellate court (with jurisdiction over matters of equity), and not the state's highest court (which is the Delaware Supreme Court).  Neither Rutledge nor the District Court cite to any Delaware

Supreme Court authority that addresses the purported unenforceability of the RSUA Non-Competes.    Further, the *Ainsle* decision is an unpublished opinion of the Delaware Chancery Court.    While an unpublished opinion can constitute persuasive authority under Delaware law (under the right facts), it is not considered *stare decisis. See State v. Phillips,* Del.Ch., 400 A.2d 299, 308 (1979).  This is "especially so as to issues not fully considered or discussed." *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987).  And in *Ainslie*, the court did not attempt to distinguish the numerous Delaware appellate decisions (or other courts applying Delaware law) cited *supra* that have viewed stock forfeiture agreements as not being governed by a reasonableness analysis.

Therefore, even if the *Ainsle* decision were on point (which it is not), and even if its holding dictated that a reasonableness analysis be applied in the context of the RSUA forfeiture provision (which it does not), *Ainsle* still does not constitute binding authority, much less binding authority from the Delaware Supreme Court. To the contrary, *Ainslie* is at odds with other Delaware authority and should not be followed. Yet the District Court's decision hangs almost entirely on this thin reed.

44

**C.    The District Court's Ruling Also Is Based on Other Flawed Factual and Legal Arguments.**

The District Court's ruling is tainted by other logical and legal flaws. In its MSJ Order, the District Court likens the RSUA claw back provision to a liquidated damages provision. This overlooks the fact that the United States District Court for the District of Delaware and the Delaware Superior Court have already considered and rejected this very argument explicitly in the context of a stock equity agreement. *Dunai*, 2021 WL 1751347, *2; *Hall*, 2005 WL 406348, *2. The forfeiture provision is not an abstract estimate of damages to LKQ for Rutledge's breach of the non-competition provision. To the contrary, LKQ only seeks to recapture the financial benefit Rutledge had already received pursuant to the parties' bi-lateral contractual promises—promises Rutledge violated by resigning and immediately becoming employed by one of LKQ's largest direct competitors. *See Id.*

Other arguments advanced by Rutledge and credited by the District Court likewise should be rejected. The District Court states that the *Hall* and *Pierce* decisions are distinguishable because these cases were decided under an arbitrary and capricious standard as the courts were reviewing administrative decisions (made by a stock committee). *See*

45

MSJ Order, p. 12 (citing *Hall*, 2005 WL 406348, at *2; *Pierce*, 517 F. Sup. 2d at 962-64). This is a red herring. While an arbitrary and capricious standard may have applied to review of the committees' respective determinations that a breach of a covenant and related forfeiture was legally grounded, this is a separate issue from whether the underlying agreement is legally unenforceable as a matter of law. *Id.* The courts in these decisions did not apply a "restrictive covenant" reasonableness analysis to the legal enforceability of these provisions because it was not required under Delaware law for stock equity forfeiture provisions, regardless of any deference to a committee's determination. *Pierce*, 517 F. Sup.2d at 969 (court finds that "taking a 'fresh look' at the parties' contract and surrounding circumstances, the court is persuaded J.P. Morgan was correct in its interpretation of the parties' contract"); *Hall*, at *5 (court states that it "is unpersuaded by the Defendant's liquidated damages argument," wholly apart from any deference to a committee determination).

The District Court goes on to state that the LKQ cases are distinguishable because they involved "higher level" employees. MSJ Order, p. 9, 12. Once again, however, the District Court draws a baseless

distinction that has no bearing upon whether LKQ was entitled to enforce its forfeiture provision. Perhaps this distinction would have some relevance if the RSUA were to be governed by a "reasonableness" analysis, but it has no application to a straightforward contract analysis. The undisputed fact is that Rutledge was considered important enough to be granted substantial equity in the Company, and all he had to do was refrain for a limited time period from competing in exchange for such generous benefits.

In any event, the District Court's depiction of Rutledge as a beleaguered "middle manager" is belied by the record evidence, which demonstrates the substantial role he played managing LKQ's operations in Lake City, Florida, and, later, in a quite similar role as a Regional Area Manager for Fenix Parts. The District Order's slanted presentation of the evidence is further belied by Rutledge's access to all manner of LKQ's non-public, competitively sensitive trade information running a 40+ employee, 60-acre facility. Similarly, the District Court's representation that the equity that Rutledge received constituted a "modest" financial benefit is strained at best, and at worst, simply belied by the record. MSJ Order, p. 9. The District Court's analysis overlooks Rutledge's

47

disingenuous "have my cake and eat it too" approach to his contractual obligations, with Rutledge retaining hundreds of thousands of dollars in compensation while immediately becoming employed by LKQ's direct competitor in violation of the RSUAs.

### D. Even If a Reasonableness Test Applies to the Analysis of the RSUAs, the District Court Applied the Wrong Version of the Test.

As demonstrated above, the District Court committed reversible error in applying a reasonableness analysis to the RSU forfeiture provisions at issue here. Even if this were not the case, however, the District Court applied the wrong standard in determining that the RSUAs were legally unenforceable. Notably, the *Ainsle* decision—on which the District Court heavily relied for its ruling on the RSUAs— reviewed the restriction at issue in that case "under the more lenient or employer-friendly review that Delaware affords restrictive covenants in the sale of a business as compared to an employment agreement." *Id.*, at **25-26. Under Delaware law, the reasonableness of restrictive covenants in the "sale of business" context is analyzed with far less scrutiny than the reasonableness of restrictive covenants in the employment context. *See O'Leary v. Telecom Res. Serv.* LLC, No 10C-

3108-108, WL 379300 at **4-5 (Del. Super. Ct. Jan. 4, 2011) (observing that Delaware courts have upheld noncompetition covenants in the sale of business context with a temporal scope as long as 10 years). Therefore, Rutledge's and the District Court's reliance on the *Hamilton* and *Cameron* decisions (which were decided in the employment context) as supporting the alleged overbreadth of the RSU Non-Competes is baseless. MSJ Order, p. 8.

Delaware courts applying a reasonableness test to non-competition covenants in the sale of business context have upheld covenants far more restrictive and onerous than the limited 9-month covenants at issue in the RSUAs. *See, e.g., Kan–Di–Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (holding that a non-compete restricting competition for five years in twenty-three states was enforceable in the sale of business context); *O'Leary*, 2011 WL 379300, at *3 (holding that a non-compete restricting competition for four years for the entire United States was enforceable in the sale of business context). Thus, even if the Court should have applied a reasonableness test (which it should not), the District Court applied the wrong version of the reasonableness test, and had it applied the correct

version, the RSUA would pass muster under the more lenient sale of business test.[10]

For all the above reasons, the District Court's Order denying LKQ summary judgment, and conversely granting summary judgment for Rutledge, on the grounds that the RSUAs are overly broad and legally unenforceable constitutes reversible error. This Court should reverse summary judgment for Rutledge on Count I of the FAC and enter judgment for LKQ on that same Count.

## II. The Court Should Reverse the District Court's Order Granting Summary Judgment to Rutledge on Count II and Remand for Further Proceedings.

### A. The RCA Non-Competes Are Not Legally Unenforceable Restraints on Trade.

The District Court also committed reversible error in granting summary judgment to Rutledge (the movant) on Count II of the FAC for violation of the RCAs. All facts and inferences are drawn in the light most favorable to the nonmoving party on a motion for summary

---

[10] For the reasons articulated in Section II.A. below, a review of the factual record also establishes that the restrictions in the RSU Non-Competes are reasonable. At a bare minimum, and should this Court determine that a reasonableness analysis in the sales of business context should be applied, the record reflects a factual dispute and jury question on this issue that will need to be remanded to the District Court for trial.

judgment. *Birch Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). Thus, Rutledge (as the movant on Count II) bears the burden to show there is no genuine issue of material fact with respect to his motion as to the RCA Non-Competes. *Id.*

Under Illinois law, a restrictive covenant is considered to be reasonable under a "three- dimensional rule of reason" only if the covenant: "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equipment Co. v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2011).[11]

The framework set forth in *Reliable Fire* is fact-intensive by definition. "Reasonableness is gauged not just by some but by all of the circumstances. The same identical contract and restraint may be reasonable and valid under one set of circumstances, and unreasonable and invalid under another set of circumstances." *Id.* at 402-43. Factors to be considered in this analysis include, but are not limited to, the near-

---

[11] The District Court applied Illinois law to the review of the RCAs based on the Illinois choice of law provision set forth in these agreements. *See* MTD Order, p. 9.

permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. *Id.*

"Under *Reliable Fire*, the totality of the circumstances will need to be considered to determine whether the restrictive covenants contained in the Agreement are enforceable." *Aircraft Gear Corp. v. Lentsch*, No. 18 C 50244, 2023 WL 2368038, at *12 (N.D. Ill. Mar. 6, 2023); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 19 CV 7092, 2021 WL 83550, at *45 (N.D. Ill. Jan. 30, 2023), *aff'd* 8 F.4th 531 (7th Cir. 2021) (denying summary judgment and finding that because "Illinois Supreme Court precedent require[s] courts to evaluate the reasonableness of legitimate business interests under the totality of the circumstances, *see Reliable Fire*, 965 N.E.2d at 403-04, the parties must have a full opportunity to develop the relevant factual record at trial.").

The RCA Non-Competes at issue here prohibited Rutledge from "caus[ing], engag[ing] in, represent[ing], furnish[ing] consulting services to, be[ing] employed by or hav[ing] any interest in . . . any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" <u>within 75 miles</u> of any LKQ facility that Rutledge

supervised or worked and for a period of <u>9 months</u> following the termination of his employment for any reason. *See, e.g.,* 2020 RC Agreement at 2 (emphasis added).

In ruling that the RCA Non-Competes were legally unenforceable, the District Court did not fully consider the factual record before it. To the extent that it did consider the factual record, it provided a selective account that bordered upon advocacy for Rutledge and ignored key facts cited by LKQ. At summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The District Court's failure to properly examine the totality of circumstances based on all the record evidence in determining the reasonableness of the RCA Non-Competes usurped the function of the jury and constitutes reversible error.

The RCAs were appropriately tailored to protect legitimate business interests of LKQ. For more than a decade, Rutledge was a senior manager for LKQ with substantial and comprehensive authority over the full scope of LKQ's auto salvage business in the Lake City, Florida market. *See* Factual Background, Section A(2)(a), *supra*, for

detailed description of Rutledge's managerial responsibilities.  In return for his services, LKQ provided Rutledge with substantial compensation in the form of a six-figure salary, bonuses, and restricted stock.  Indeed, Rutledge received stock equity grants with a value over $300,000.  Given the substantial consideration that LKQ paid to Rutledge over the course of a decade, it was not unreasonable for LKQ to expect that Rutledge would not work for a direct competitor of LKQ in the Lake City, Florida market for a limited period of 9 months.

In evaluating the reasonableness of a non-competition covenant, Illinois courts consider the employer's interest in protecting the disclosure of confidential trade information.  *See, e.g., Reliable Fire*, 965 N.E.2d at 401 (an "employer has a legitimate business interest in restraining the employee from appropriating the employer's confidential trade information."); *Act II Jewelry, LLC v. Wooten*, 318 F. Sup.3d 1073, 1092 (N.D. Ill. 2015) (recognizing the protection of confidential business information as a legitimate business interest).

It is undisputed that Rutledge had access to LKQ's commercially sensitive trade information.  This included daily sales and revenue information, reports containing profitability and customer sales volume,

and key performance indicators, including profit margins. *See id.*, Section A(2)(a) and A(3), *supra*. There can be no dispute that an employee who is responsible for the full scope of operations of LKQ's auto salvage enterprise in a specific market (from salvage, to production, to sales, to distribution, to customer service) has access to valuable competitive information and that the factfinder could reach this determination at trial. The District Court's conclusion that LKQ has not presented evidence that Rutledge's employment with a direct competitor of LKQ could cause competitive harm to LKQ is untethered to the facts in this case. MSJ Order, p. 15.

Illinois courts have also held that an employer has an interest in protecting confidential information relating to customers. *See Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 443 (Ill. App. Ct. 1997). This is particularly true where the employee's job duties "involved extensive customer contact and intimate knowledge of customer requirements." *See Sabre Indus., Inc. Waller Waller v. Sabre Indus., Inc.*, No. 18-CV-2111, 2021 WL 6129000, at *15 (C.D. Ill. Aug. 13, 2021). Here, Rutledge also had responsibility for developing relationships and providing services to LKQ's customers. This included

interacting directly with LKQ customers and participating on sales visits to obtain new customers.   Rutledge also accessed a vast array of valuable information relating to LKQ's customers and customer relationships, including customer pricing, sales figures, and discount programs. *See id.*, Section A(3) *supra*.

In sum, there can be no question on these facts that LKQ's RCAs advanced a legitimate business interest.

Furthermore, the RCAs were no broader than necessary to protect LKQ's legitimate business interests.  Turning first to geographic scope, the limitation of 75-miles from the Lake City facility is also reasonable under Illinois law.   Illinois "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business" when assessing a restrictive covenant's reasonableness. *Aquila Inv. Grp., LLC v. Hiller*, No. 16-CV-2351, 2019 WL 13227324, at *16 (C.D. Ill. May 31, 2019) (citing *Cambridge Eng., Inc. v. Mercury Parts. 90 Bl, Inc.*, 879 N.E.2d 512, 523 (Ill. App. Ct. 2007)).  While not at issue here as to the RCAs, Illinois courts have even approved non-competition covenants that lack geographic limitations when the employer's business activities are nationwide.  *Id.*

The 75-mile territorial limitation is coextensive with the area and market surrounding the Lake City Facility. Rutledge managed LKQ's operations and business in the Lake City market for more than a decade. Illinois courts have repeatedly enforced non-competition covenants with a geographic radius that is analogous to or broader than the 75-mile radius at issue in the RCA Non-Competes.[12] *See Prairie Eye Ctr., Ltd. v. Butler*, 768 N.E.2d 414, 418-19 (Ill. App. Ct. 2002) (upholding non-compete provision precluding former employee from rendering competitive services within the particular geographic area in which the former employer operated); *Midwest Tel., Inc. v. Oloffson*, 699 N.E.2d 230, 235 (Ill. App. Ct. 1998) (finding 100-mile-radius was reasonable because it was "reasonably coextensive with [the former employer's] business territory").

Turning next to temporal scope, the non-competition covenants in the RCAs only prohibit competitive activities for a period of 9 months. Yet again, Illinois courts have frequently found non-competition

---

[12] Even if the District Court determined that the geographic restriction was overly broad, this should not have ended the analysis, as the District Court could have modified ("blue-penciled") the covenant to encompass a more limited territory that the Court determined was appropriate, as discussed *infra*.

covenants with longer durations to be enforceable. *See Midwest Tel., Inc.*, 699 N.E.2d at 235 (finding a one-year temporal term reasonably related to the former employee's business development); *Milliard Maint. Serv. Co. v. Bernero*, 566 N.E.2d 379, 387-88 (Ill. App. Ct. 1997) (finding two-year time restriction in a covenant not to compete was reasonable).

The District Court placed undue emphasis upon the RCA's prohibition of all employment of Rutledge by a competitor without reference to specific duties or position, instead of properly balancing that against the narrow temporal and geographic scope of the provisions. Furthermore, the non-competition prohibition should have been evaluated in the context of the record in this case. Rutledge was designated as a "Key Employee" and the RCAs were clearly not intended to prevent Rutledge from working in some low-level employment by a competitor, but rather to prevent exactly what happened here: Rutledge leaving for substantial employment with a direct competitor, Fenix Parts, in a role in which he would be able to exploit his inside knowledge of LKQ's business information.

Illinois courts have upheld non-competition restrictions comparable to those at issue here. For example, in *Mickey's Linen v. Fischer*, No. 17

C 2154, 2017 WL 3970595 (N.D. Ill. Sept. 8, 2017), in the context of a preliminary injunction hearing, the court upheld a non-competition covenant prohibiting the employee from "directly or indirectly, engag[ing] in any business, enterprise or employment located in the geographic areas designated below [Cook, Lake, and DuPage Counties], whether as owner, partner, officer, director, shareholder, independent contractor, consultant, employee, agent, advisor, investor or otherwise (collectively "Participant"), which directly or indirectly engages in the same or a similar business to the Business or any other activity in which the Company is engaged or which otherwise competes with the Company." *Id.*, **1-2. The temporal and geographic scope (encompassing three counties for a period of 18 months) of this non-compete were broader than the same provisions in the RCA Non-Competes. Further, the prohibition of employment with a business that engages in any activity "in which the Company is engaged or which otherwise competes with the Company" is analogous to the restriction in the RCAs here. In *Mickey's Linen*, the covenant was executed by a route representative who was later promoted to a Service Manager position for a linen uniform and rental sales company-- a position which entails less comprehensive responsibility

than a Plant Manager for LKQ. *Id.*, **3-4. The court exercised its discretion to limit the scope of the competitive restriction to "businesses" that were competitive linen uniform and rental sales companies. *Id.*, *15. Here, too, the District Court could have limited the scope of the competitive restriction here to the extent it was overly broad.

Further support is found in *Sarah Bush Lincoln Health Ctr. v. Perket*, 605 N.E.2d 613, 614-17 (4th Dist. 1992) (affirming preliminary injunction for employer), where the court upheld a one-year, one county noncompete against a hospital's former director and administrator which provided that the former employee, "shall not, directly or indirectly, invest in, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any person, firm, or corporation engaged in competition with Hospital in providing health services or facilities within Coles County…" *Id.* That provision, too, is quite similar in scope to the competitive restriction at issue in these RCAs signed by Rutledge.

The cases the District Court relied upon with respect to the RCAs are distinguishable. In *StunFence, Inc. v. Gallagher Sec (USA), Inc.*, 2002 WL 1838128 (N.D. Ill. Aug. 12, 2002), the court found that the language

in the non-competition covenant precluded the employee from "participating in any way in the security fencing business anywhere in the world." *Id.* at 21. There is a wide gulf between a 75-mile restriction and effectively anywhere in the world. Moreover, there is no discussion in *StunFence* as to the temporal scope of the restriction. The non-competition covenant in *Medix Staffing*, another case cited by the District Court, was for a period of 18 months, or twice as long as the 9-month restriction at issue here. *Medix Staffing Solutions, Inc, v. Dumrauf*, 2018 WL 1859039, at *3 (N.D. Ill. April 17, 2018).

Other cases cited by the District Court likewise are not on point. The non-competition covenant at issue in *Hays Grp., Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415 (N.D. Ill., Sept. 2009) was for a period of two years and did not contain any geographic limitation. *Id.*, at **4-5. Again, a two-year covenant without any geographic limitation is not analogous to the RCA Non-Compete. The non-competition covenant at issue in *Cambridge Eng., Inc. v. Mercury Parts 90 Bl, Inc.*, 879 N.E.2d 512 (Ill. App. Ct. 2007) provided that the employee could not engage in any competitive activity for a period of two years. *Id.*, pp. 522-526. Further, the non-competition covenant in *Cambridge Eng.* encompassed the entirety of the United

States and Canada, which the Court found was not co-extensive with the employee's duties for the employer or the areas in the which the company conducted business. *Id.*

The RCA Non-Competes were not only appropriately tailored to protect LKQ's legitimate business interests, but they also imposed no undue hardship on Rutledge, and were not injurious to the public interest. Rutledge was only prevented from working for a competitor for a limited period of nine months and within a 75-mile radius of the Lake City facility. Given the substantial compensation Rutledge received in the form of stock equity grants, these limited restrictions did not impose an undue hardship on Rutledge in that he could perform work outside of the Lake City market and was well compensated not to work for an LKQ competitor in the Lake City market for 9 months.

**B.    The Conclusions Drawn by the District Court In the MSJ Order As To the RCAs Are Not Supported by the Factual Record or the Law.**

The District Court's Order also advances several other flawed arguments in support of summary judgment in Rutledge's favor on LKQ's claim for breach of the non-competition covenants in the RCAs (Count II).

The District Court inexplicably states that LKQ's interest in enforcing the RCA Non-Competes is limited to its supplier or vendor relationships. Order, p. 17-18. This conclusion is not correct. To the contrary, LKQ's corporate deponent (Robert Six) testified that through these agreements (including the RSUAs and RCAs), LKQ seeks to protect "specific customer pricing, customer discounts, customer contact information…vendor and supplier pricing, any potential rebates…financial information, revenue, margin data, expense data, profitability data…[and] any marketing strategies for Rutledge's market." ECF 79-2, p. 27; Six Deposition, p. 98. As Rutledge is the movant with respect to Count I of the FAC, his contention that LKQ sought to enforce the RCAs exclusively to protect supplier or vendor relationships cannot be credited in the face of this testimony.

Regardless, Illinois courts have held that an employer's interest in its supplier and vendor relationships can justify a non-competition restriction. *See Tower Oil & Technology Co., Inc. v. Buckley*, 425 N.E.2d 1060, 1066 (Ill. App. Ct. 1981) (finding that prior knowledge of the needs of a customer would assist a former employee in persuading the customer to change suppliers). The record evidence in this case establishes that

Rutledge had managerial responsibilities with respect to LKQ's vendors and negotiated with LKQ vendors. The record further establishes that Rutledge performed these same duties with Fenix Parts through his work in managing capital projects. These are legitimate protectable interests.

In further support of its ruling, the District Court stated that LKQ had not established that Rutledge violated the non-solicitation or non-disclosure provisions in the RCAs. MSJ Order, p. 9-10. This, too, is of no moment as LKQ does not assert a claim for violation of the non-solicitation provisions under the RCAs or the RSUAs in the FAC. *See generally*, FAC. Furthermore, the non-competition, non-solicitation, and non-disclosure provisions are distinct contractual covenants. Neither Rutledge nor the District Court cite to any authority supporting the proposition that an employer must establish breach of a non-solicitation and non-disclosure provision in order to establish an independent breach of a non-competition covenant.

### C.  The District Court Erred in Declining to Modify Any Overly Broad Provision in the RCA Non-Competes.

The District Court's decision not to modify the RCA Non-Competes (to the extent they can be deemed to be overbroad) was also error. Illinois courts can modify or strike provisions in an overly broad restrictive

covenant on equitable grounds. *See, e.g., Weitekamp v. Lane,* 620 N.E.2d 454, 461 (Ill. App. Ct. 1993) (upholding the trial court's decision to modify a covenant not to compete); *Arpac Corp. v. Murray,* 589 N.E.2d 640, 652 (Ill. App. Ct. 1992) (upholding the lower court's modification of a restrictive covenant); *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 529 (Ill. App. Ct. 2007) (same).

The case for judicial modification is strengthened where the parties have evinced their intent to allow a court to modify or sever alleged unenforceable provisions. *See Abbott-Interfast Corp. v. Harkabus*, 250 Ill. Ap. 3d 13, 20 (2d Dist. 1993). Under each of the RCAs, the parties agreed that a court shall have the power to modify or delete or sever a provision to render the agreement enforceable. *See* FAC, ¶ 47. "[W]hether a severability provision applies to 'blue-pencil' the Agreement will depend on the totality of the circumstances." *Lentsch*, No. 18 C 50244, 2023 WL 2368038, at *12.

For the reasons established herein, the RCA Non-Competes are reasonable. To the extent that any aspect of the restriction in the RCA Non-Competes is overly broad, the equities in this case favor modification. For example, if, as the District Court contends, the 75-mile

radius is either overly broad or "arbitrary," the District Court could narrow this provision.  Similarly, to the extent that the Court accepts Rutledge's hypothetical "janitor" argument, the Court could revise the covenant accordingly to limit it to personally competitive conduct.

For all the above reasons, the District Court's Order granting summary judgment to Rutledge on Count II of the FAC constitutes reversible error.  This Court should deny Rutledge summary judgment on Count II of the FAC and remand this case to the District Court for trial on Count II.

## III. The Court Should Reverse the District Court's Order Dismissing LKQ's Claim for Unjust Enrichment.

Count III of the FAC pleads a claim in the alternative for unjust enrichment.  Specifically, LKQ seeks to recover the amount of stock equity compensation under the RSUAs that Rutledge unjustly retained to LKQ's detriment.  The District Court's dismissal of Count III also constitutes reversible error.

Plausibility is the basic test for pleadings on a motion to dismiss. A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim for unjust enrichment, LKQ must plead that Rutledge "has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012). Here, LKQ has pled that: "As a result of his misconduct, Rutledge has been unjustly enriched, to LKQ's detriment, through the granting and sale of restricted stock under LKQ's incentive compensation plan." FAC, ¶ 104. "Rutledge's conduct as described herein constitutes circumstances wherein it would be manifestly unjust, grossly unfair, and unconscionable to allow Rutledge to retain any benefit or profit generated from his sale of the stock that was granted to him under LKQ's equity incentive compensation plan." *Id.*, ¶ 105. LKQ has further pled that it has no adequate remedy at law for … "the sale of equity grants that were acquired through false pretenses and conduct in breach of the RSU Agreements; thus, injunctive

relief is appropriate." *Id.*, ¶ 110.   Therefore, LKQ has pled that it seeks an equitable remedy to disgorge the benefits from Rutledge's restricted stock proceeds that is outside the contractual remedy.

Based on these allegations, LKQ has pled the requisite elements of a claim for unjust enrichment.   Moreover, LKQ has pled that it seeks equitable relief (*i.e.*, a remedy not on the contract) for reimbursement of the proceeds from Rutledge's sale of his equity interest.

Under Fed. R. Civ. P. 8(d)(2), a "party may state as many separate claims or defenses as it has, regardless of consistency."   Fed. R. Civ. P. 8(d)(3).    Further, Fed. R. Civ. P. 8(e)(2) permits a party to plead alternative theories of relief under both legal and equitable grounds, even if the theories are inconsistent.   *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003).   Under this doctrine, a party is allowed to plead breach of contract, or if the court finds no contract was formed, to plead a claim for quasi-contractual relief.   *Id.*; *see also In re Fluidmaster, Inc.*, 149 F. Sup. 3d 940, 963 (N.D. Ill. 2016) (holding that plaintiffs could plead inconsistent breach of contract and unjust enrichment claims).

As this Court has explained, the parties "need not use particular words to plead in the alternative, they must use a formulation from which it can be reasonably inferred that this is what they were doing." *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000). At the pleading stage, the court draws all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011). A review of the FAC reveals that LKQ sufficiently pled a claim for unjust enrichment. Moreover, contrary to the District Court's unnecessary legal formalism, the allegations in the FAC further provide that LKQ is seeking an equitable remedy for this quasi-contractual claim.

The District Court's dismissal of Count III is especially unjust in hindsight given its later ruling on summary judgment that LKQ could not enforce the contractual remedies under the RSUAs and RCAs. This is precisely why LKQ pled unjust enrichment in the alternative. There must be a remedy for Rutledge's brazen acceptance of substantial equity grants and subsequent departure to work in a competitive capacity with one of LKQ's chief competitors.

Accordingly, the District Court should remand Count III to the District Court for further proceedings and trial.

## CONCLUSION

For all the above reasons, LKQ respectfully requests that this Court: (1) reverse summary judgment for Rutledge on Count I of the FAC and enter judgment for LKQ on that same Count; (2) reverse summary judgment for Rutledge on Count II of the FAC and remand this case to the District Court for trial on Count II; and (3) remand Count III to the District Court for further proceedings and trial.

Respectfully submitted,

*/s/ Joel W. Rice*
Craig R. Annunziata
Joel W. Rice
James M. Hux, Jr.
FISHER & PHILLIPS LLP
10 S. Wacker Drive
Suite 3450
Chicago, IL 60606
312-346-8061

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(A)(7) Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because:

> this brief contains <u>13,966 words</u>, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)

because:

> this brief has been prepared using Microsoft Word in <u>14 Point Century Schoolbook</u>

> */s/ Joel W. Rice*
> Joel W. Rice
> Craig R. Annunziata
> James M. Hux, Jr.
> FISHER & PHILLIPS LLP
> Suite 3450
> 10 S. Wacker Drive
> Chicago, IL 60606
> 312-346-8061
>
> *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

The undersigned, counsel for Appellant LKQ Corporation, hereby certifies that on September 8, 2023, the foregoing Brief and Required Short Appendix of Appellant was filed via the Court's CM/ECF System, which will send notice of such filing to all registered users.

/s/ Joel W. Rice
Joel W. Rice
Craig R. Annunziata
James M. Hux, Jr.
FISHER & PHILLIPS LLP
Suite 3450
10 S. Wacker Drive
Chicago, IL 60606
312-346-8061

*Counsel for Appellant*

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(D), Counsel Certifies that all Material

Required by Circuit Rule 30(A) And (B) Are Included in the Appendix.

*/s/ Joel W. Rice*
Joel W. Rice
Craig R. Annunziata
James M. Hux, Jr.
FISHER & PHILLIPS LLP
Suite 3450
10 S. Wacker Drive
Chicago, IL 60606
312-346-8061

*Counsel for Appellant*

**NO. 23-2330**

In The

# United States Court Of Appeals

## For The Seventh Circuit

### LKQ CORPORATION,

*Plaintiff/Counter-Defendant- Appellant,*

v.

### ROBERT RUTLEDGE,

*Defendant/Counter-Claimant- Appellee.*

ON APPEAL FROM THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
THE HONORABLE THOMAS M. DURKIN, DISTRICT COURT JUDGE
CASE NO. 1:21-CV-03022

————————————

## REQUIRED SHORT APPENDIX

————————————

Craig R. Annunziata
James M. Hux, Jr.
Joel W. Rice
FISHER & PHILLIPS LLP
Suite 3450
Ten S. Wacker Drive
Chicago, IL 60606
312-346-8061

*Counsel for Appellant*

## ATTACHED REQUIRED SHORT APPENDIX
## TABLE OF CONTENTS
### See Fed. R. App. P. Rule 30(a)

Page:

**Memorandum Opinion and Order**
　　filed May 27, 2022 [ECF58].....................................................................SA1

**Memorandum Opinion and Order**
　　filed June 13, 2023 [ECF92] ...............................................................SA18

**Judgment in a Civil Case**
　　filed June 13, 2023 [ECF93] ...............................................................SA41

**Notice of Appeal**
　　filed July 5, 2023 [ECF94] ..................................................................SA42

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LKQ CORPORATION,

    Plaintiff/Counter-Defendant,

       v.

ROBERT RUTLEDGE,

    Defendant/Counter-Plaintiff.

No. 21 C 3022

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

LKQ Corporation brought this action against its former employee, Robert Rutledge, for breach of restricted stock unit agreements and restrictive covenant agreements. Rutledge brought counterclaims seeking declaratory judgment, as well as claims for unpaid wages and tortious interference. Both parties filed motions to dismiss which are currently before the Court. For the reasons that follow, Rutledge's motion to dismiss, R. 28, and LKQ's motion to dismiss, R. 12, are granted in part and denied in part.

## Background

LKQ is a national supplier of various automobile parts to mechanical shops, repair shops, and other customers. Beginning in 2009, Rutledge worked as a plant manager for LKQ. Because of his role and access to LKQ's confidential information, he was designated as a "key employee" and was therefore eligible for grants of LKQ restricted stock. Between 2013 and 2020, Rutledge and LKQ entered into separate restricted stock unit agreements ("RSUAs") providing Rutledge with the right to

**SA1**

exercise shares of LKQ stock pursuant to certain terms and conditions. One such condition provided that, for nine months after his employment with LKQ ended, Rutledge:

> Shall not directly or indirectly … be employed by, engage or have any interest in any business which is or becomes competitive with [LKQ] subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of [LKQ] or its subsidiaries…

R. 25 at 6. During his employment, Rutledge cashed in his restricted stock units and received approximately $317,507.02 as a result.

The RSUAs also contained a forfeiture clause, which provided that Rutledge would forfeit his restricted stock if he breached the terms and conditions:

> [T]he RSUs, the shares of common stock of the Company underlying the RSUs, or any proceeds received by the Key Person upon the sale of shares of common stock of the Company underlying the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the date of this Agreement and ending nine months following the termination of the Key Person's affiliation with the Company and/or its subsidiaries…

R. 25 at 7-8.

Separately, Rutledge and LKQ also entered into Confidentiality, Non-Competition, and Non-Solicitation Agreements ("RC Agreements") over the course of his employment. These agreements contain restrictions on Rutledge's employment for nine months after his departure from LKQ and within a 75-mile radius of the facility he formerly managed.

Upon voluntarily resigning from his position on April 14, 2021, Rutledge began working for Fenix Parts, Inc. On June 4, 2021, LKQ brought this action against

**SA2**

Rutledge for breach of contract and unjust enrichment, alleging he violated his RSUAs and RC Agreements by working for Fenix, which LKQ contends is a direct competitor. Rutledge filed a three-count counterclaim, seeking declaratory judgment on a number of issues, as well as alleging unpaid wages and tortious interference.

Both parties moved to dismiss the other's respective claims. Rutledge argues LKQ failed to state a claim for breach of the RSUAs or RC Agreements and that its unjust enrichment claim is barred. LKQ argues Rutledge's counterclaims are duplicative and that he failed to sufficiently plead them.

## Legal Standard

A Rule 12(b)(6) motion challenges "the sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

**SA3**

liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Analysis

### I.    Rutledge's Motion to Dismiss

Rutledge argues LKQ's complaint should be dismissed in its entirety because the RSUAs and RC Agreements are unenforceable as a matter of law, and the unjust enrichment claim is barred because the parties' relationship was governed by a contract.

### A.  Count I: Breach of the RSUAs

#### i.   Choice of Law

As a preliminary matter, the RSUAs have a choice-of-law provision requiring the application of Delaware law. R. 31 at 5. Rutledge briefly argues Delaware has no substantial relationship to the parties and thus Illinois law has a should apply. R. 29 at 6.

A federal court exercising jurisdiction over state-law claims applies the choice of law rules of the forum state. *McCoy v. Iberdrola Renerables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). In Illinois, a contract's choice of law provision governs unless: (1) the chosen state has no substantial relationship to the parties or the transaction; or (2) application of the chosen law would be contrary to fundamental public policy of a state with a materially greater interest in the issue in dispute. *General Electric Co.*

## SA4

*v. Uptake Technologies*, 394 F. Supp. 3d 815, 825 (N.D. Ill. 2019) (citing *Old Republic Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, 906 N.E.2d 630, 636 (Ill. App. Ct. 2009)). Before undertaking a choice-of-law analysis, the party seeking the determination "bears the burden of demonstrating a conflict, i.e., that there exists a difference in the law that will make a difference in the outcome." *Id*. (citing *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 906 (Ill. 2014)). *See also Garrard v. Rust-Oleum Corp.*, 2021 WL 5906063, at *5 (N.D. Ill. Dec. 14, 2021).

Here, Rutledge has not shown a conflict exists between Delaware and Illinois law such that it would make a difference in the outcome. He argues Delaware has no relationship to the parties or the transaction because he is a Florida resident and LKQ maintains its headquarters in Illinois. R. 29 at 6. He then contends that "Illinois' policy of protecting employees to a greater extent than other states justifies applying Illinois law," but he does not offer any explanation as to the differences in how Delaware and Illinois "protect employees." *Id*. Importantly, Rutledge later argues that the same outcome results from either Delaware or Illinois law. R. 29 at 6, 8.

LKQ is incorporated in Delaware, and sells many of its goods there. R. 31 at 5. Rutledge offers nothing to overcome these facts, and even if the Court were to lend more weight to his vague allegations that the policies of each state differ, small differences do not justify overriding the parties' original choice to have Delaware law govern. *See Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994)).

Because Rutledge has not shown a legitimate difference between the two states' laws, or that applying Delaware law would be contrary to a fundamental

**SA5**

public policy of Illinois, the Court applies Delaware law, as provided for in the contract. *See Maroon Society, Inc. v. Unison Consulting, Inc.*, 2021 WL 2809515 (N.D. Ill. July 6, 2021) (Court declined to apply California law because although the plaintiff "focuse[d] on California's 'materially greater interest,'" he did not "identify what fundamental policy of California is at issue or how applying Illinois law would be contrary to that policy.").

     ii.   <u>Merits</u>

Rutledge first argues that the non-compete provisions in the RSUAs are overbroad and unenforceable. A post-employment restrictive covenant is reasonable only if it: (1) is no greater than required for the protection of a legitimate business interest of the employer; (2) does not impose undue hardship on the employee; and (3) is not injurious to the public. *FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *6-7 (Del. Ct. Chan. Mar. 27, 2020); *see also Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011). The inquiry is a fact-intensive one, and "unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record.*" Allied Waste Servs., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1110 (N.D. Ill. 2016).

Here, the non-compete provision of the RSUAs purports to bar Rutledge from "directly or indirectly, be[ing] employed by, engag[ing] or hav[ing] any interest in any business" which competes with LKQ or its subsidiaries for a period of nine months after his departure from LKQ. R. 25 at 6. The business of LKQ is selling various auto parts to repair and mechanic shops nationwide. The Court acknowledges the

**SA6**

reasoning in Rutledge's argument—barring him from working for any competitor of LKQ in virtually any capacity appears to be a broad restriction. But the provision is subject to a temporal limit—nine months from the date of Rutledge's departure from LKQ. This durational limitation weighs in favor of denying the motion to dismiss. *See Allied Waste*, 177 F. Supp. 3d at 1110. To determine that the provision is overbroad at the pleading stage would be premature. Whether such restrictions are reasonable "requires the Court to make a fact-based determination" that is often "not appropriate" at the motion to dismiss stage. *Nortek Products Ltd. v. GNA Group, Inc.*, 2011 WL 2110043, at *4 (N.D. Ill. May 24, 2011) (collecting cases); *see also Integrated Genomics, Inc. v. Kyrpides*, 2008 WL 630605, at *7 (N.D. Ill. Mar. 4, 2008) (holding that, even though the non-compete agreement at issue was unlimited in both geographical scope and duration, it would be inappropriate to determine its reasonableness on a motion to dismiss).[1]

The reasonableness of the RSUAs hinges on a variety of factual issues that the Court cannot meaningfully address on the limited record currently before it, and that

---

[1] Rutledge relies on *Hay Group v. Bassick*, 2005 WL 2420415 (N.D. Ill. Sept. 29, 2005), to support his argument that the non-compete provision in the RSUAs is overbroad on its face. *Hay Group* was decided at the summary judgment stage, and the court thus had the entire evidentiary record in front of it. The Court here does not yet have that benefit. Rutledge also relies on *Tasktop Technologies US Inc. v. McGowan*, 2018 4938570 (D. Del. Oct. 11, 2018). *Tasktop* involved a motion for a preliminary injunction, which the court denied because the plaintiff had not shown it was likely to succeed on the merits. Here, LKQ does not need to meet that bar. It only needs to allege a plausible claim for relief. The *Tasktop* court specifically noted it was examining the "specific factual circumstances to determine enforceability", and, notably, held a hearing and allowed limited discovery on the contract provisions before making its ruling. *Id.* at *3-5. This further reinforces that discovery is necessary here.

7

**SA7**

the parties do not shed light on in their briefings. For example, relevant to the inquiry is how many companies fall within the definition of "competitor" under the RSUAs. *See Allied Waste*, at 1110 (denying motion to dismiss to determine, among other things, how many companies are actually competitors under the challenged agreement).

Further illustrating the need for discovery is LKQ's position that the RSUAs do not contain a non-compete agreement, and that the provision at issue here is actually a forfeiture clause, as it provides for a forfeiture of Rutledge's shares of common stock if he is not in compliance with the remainder of the provision. R. 31 at 6-7. Because it is a forfeiture provision and not a non-compete, LKQ argues, the Court should decline to even undertake a reasonableness analysis. LKQ cites *JPMorgan Chase & Co. v. Pierce*, 517 F. Supp. 954, 958 (E.D. Mich. 2007), to argue there is a distinction between non-compete provisions and those calling for forfeiture of benefits. *JPMorgan* was also decided at the summary judgment stage and the parties had the benefit of discovery as to the provisions in question before the Court made its determination. The same is necessary here. At this stage, the provision is not so patently unreasonable as to warrant dismissal, and there is not enough factual development in the record for the Court to determine the extent of its enforceability, or whether it is a forfeiture provision, a non-compete provision, or both. Such a determination will be appropriate at a later stage in the proceedings.

**SA8**

### B. Count II: Breach of the RC Agreements

During his employment, Rutledge also entered into RC Agreements which imposed non-compete and non-solicitation covenants on his employment for a period of nine months after leaving LKQ and within a 75-mile radius of the facility he formerly managed. The parties agree Illinois law applies to LKQ's claim of breach of the RC Agreements. Rutledge argues the non-compete and non-solicitation provisions are unenforceable.

Under Illinois law, "[a] restrictive covenant is enforceable if the terms of the agreement are 'reasonable and necessary to protect a legitimate business interest of the employer,' a determination that turns on the facts and circumstances of each case." *LKQ Corp. v. Transtar Indus.*, No. 16-cv-499, slip. op. at 2 (N.D. Ill. Apr. 8, 2016) (quoting *Nortek Products*, 2011 WL 2110043, at *3); *see also Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999). A restrictive covenant's reasonableness is measured by its hardship on the employee, its affect upon the general public, and the reasonableness of the time, territory, and activity restrictions. *See Liautaud v. Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000).

Rutledge argues the RC Agreements are overbroad in scope and constitute an unreasonable restraint of trade, rendering them unenforceable as a matter of law. For largely the same reasons as those articulated in response to Rutledge's motion to dismiss Count I, the Court does not find this to be one of the "extreme cases" warranting a finding of invalidity at the pleading stage. *See Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1343 (Ill. App. Ct. 1993) ("Although courts closely

scrutinize noncompetition agreements…only in extreme cases will a court find such an agreement invalid on its face."). The RC Agreement is temporally limited to a period of nine months and geographically limited to a distance of 75 miles. Again, these limitations weigh against dismissing the claims based on unenforceability. And, regarding the non-solicitation agreement contained in the RC Agreements, the inquiry is "highly fact-specific and intensive," and may not be appropriate until "the circumstances have been fleshed out through litigation." *Aon plc v. Infinite Equity, Inc.*, 2021 WL 4034068, at *16 (N.D. Ill. Sept. 3, 2021); *see also Baird & Warner Residential Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1015 (Ill. App. Ct. 2008) (declining to rule on the enforceability of a non-solicitation covenant "without additional evidence that does not appear on the face of the complaint"). The same is true for Rutledge's argument that LKQ does not have a legitimate business interest that it seeks to protect through the agreements. *See AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 923 (N.D. Ill. 2001) (holding that the legitimacy of an employer's business interest is "an inherently fact-based determination that is not appropriate at the motion to dismiss stage").

At the pleading stage, LKQ has sufficiently pled that it and Rutledge were parties to an enforceable contract which Rutledge breached. Whether the restrictions imposed on Rutledge are reasonable requires the Court to make a fact-based

**SA10**

determination that is not appropriate at this stage. Rutledge's motion to dismiss Count II is denied.[2]

### C. Count III: Unjust Enrichment

In its unjust enrichment claim, LKQ seeks to recover the amounts in equity compensation under the RSUAs that it contends Rutledge unjustly retained to LKQ's detriment. Rutledge argues LKQ's claim for unjust enrichment is improper because it addresses the same conduct covered under the contract.

LKQ argues it is pleading an alternative theory of recovery, which is permitted under Federal Rule of Civil Procedure 8(d)(3), allowing a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). However, in Illinois, recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and the defendant. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). To put it another way, a plaintiff may plead breach of contract in one count and unjust enrichment in another under Rule 8, but "allegations of an express contract which governs" the parties' relationship may not be included in the unjust enrichment count. *Allergase, Inc. v. Walgreen Co.*, 2017 WL 66819 (N.D. Ill. Jan. 6, 2017) (quoting *Cohen*, 735 F.3d at 615).

---

[2] Rutledge also moves to dismiss Count IV, a claim for injunctive relief, based on his argument that it is tied to Counts I and II which he contends fail as a matter of law. Because the Court is declining to dismiss Counts I and II, it also declines to dismiss Count IV.

**SA11**

The problem for LKQ is that it argues, throughout the entirety of its complaint, that its relationship with Rutledge is governed by the employment contracts, and then incorporates each of those allegations in its claim for unjust enrichment. R. 25 at 20. "Where unjust enrichment claims incorporate by reference allegations of the existence of a contract between the parties, courts will dismiss the unjust enrichment claim." *Gociman v. Loyola Univ.*, 515 F. Supp. 3d 861, 871 (N.D. Ill. 2021) (citing *Thurgood v. Sears, Roebuck, and Co.*, 2006 WL 3302640, at *5 (N.D. Ill. Nov. 9, 2006)); *see also MD Spine Solutions, LLC v. UnitedHealth Group, Inc.*, 2022 WL 124160, at *4 (N.D. Ill. Jan. 13, 2022) (even though plaintiff argued its unjust enrichment theory was pled in the alternative, it incorporated by reference its allegations that a contract existed, warranting dismissal with leave to amend).[3]

A court in this district has encountered similar facts and dismissed an unjust enrichment claim because of the same problem present here. In *Stericycle v. Carney*, the parties disputed the reasonableness of a restrictive covenant the employee was alleged to have breached. *Stericycle*, 2013 WL 3671288, at *4 (N.D. Ill. July 12, 2013). The unjust enrichment claim alleged the plaintiff granted the former employee stock options as consideration for the restrictive covenants in the employment agreements, and that "[b]ecause of [the employee's] failure to adhere to his post-employment contractual obligations," the employee had been unjustly enriched by "his receipt and

---

[3] There are cases in which Illinois courts allowed unjust enrichment claims based on payments alleged to be unjustly retained, but only where such payments are not contemplated by the contract. *See, e.g., Clean Harbors Inc. v. Illinois International, Port District*, 309 F. Supp. 3d 556, 568-69 (N.D. Ill. 2018). Here, the payments LKQ is seeking to recover are exactly what the contract provided for.

retention of such proceeds." *Id*. at *8. The court explained in its ruling that a plaintiff "may not include specific references to a governing contract in a count for unjust enrichment." *Id*. (collecting cases). Because LKQ incorporates by reference its allegations of a contract between the parties in its unjust enrichment claim, the claim is not properly pled in the alternative, and the motion to dismiss Count III is granted.

## II.    LKQ's Motion to Dismiss

LKQ moves to dismiss Rutledge's counterclaims for declaratory judgment and unpaid wages, arguing they are not yet ripe and are duplicative of issues already before the Court as part of LKQ's lawsuit.

### A. Counterclaim I: Declaratory Judgment

In his first counterclaim, Rutledge seeks declaratory judgment on the following issues:

> (1) "Are the unsigned contracts enforceable? In other words, does LKQ have any evidence that Rutledge entered into these unsigned contracts?"; (2) "If the unsigned contracts were mutually agreed upon, are any of them unenforceable due to lack of consideration? If both the 'Restrictive Stock Unit Agreements' and the 'Confidentiality, Non-Competition and Non-Solicitation Agreements' are valid and enforceable, which law governs Plaintiff's non-compete and non-solicitation obligations?"; and (3) "[W]hich law governs the parties' employment relationship generally? In other words, which Wage Act applies to Rutledge's Counterclaim (e.g., Illinois Wage Act, 820 ILCS 115; Delaware Wage Payment and Collection Act, 19 Del. C. [SEC] 1103; Florida Unpaid Wage Claim, Fla. Stat. [SEC] 448.08).".

R. 10 at 39-40. LKQ argues all of these questions are issues already before the Court and the counterclaim is thus duplicative.

Where the counterclaim for declaratory judgment "essentially presents nothing more than the flip side of [plaintiff's] claims," courts often dismiss them. *See,*

## SA13

*e.g., Bodum USA, Inc. v. A Top New Casting Inc.*, 2016 WL 4440258, at *1-2 (N.D. Ill. Aug. 23, 2016). In such cases, courts have found that the counterclaims merely mirror the initial claim and add "nothing to the case beyond the issues [the plaintiff's] claims call upon [the court] to adjudicate." *Id*. Further, "[c]ourts routinely dismiss counterclaims that seek to generate an independent piece of litigation out of issues that are already before the court; this includes counterclaims that merely restate an affirmative defense, as well as those which simply state the opposite of the complaint." *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 1026, 1065 (N.D. Ill. 2013) (collecting cases).

Here, Rutledge's first declaratory judgment request immediately reveals itself as duplicative. Rutledge asks the Court to determine the enforceability of the contracts—so does LKQ, in its complaint. LKQ simply argues they are enforceable, while Rutledge, of course, argues they are not. That issue will necessarily be resolved through LKQ's lawsuit. Rutledge then asks whether LKQ has evidence that Rutledge entered into the agreements. LKQ alleges through its complaint that it does have such evidence, so that issue will be determined once the parties face an evidentiary standard.

The second declaratory judgment request again seeks an enforceability determination, which the Court has already explained will be made once the parties have the benefit of discovery, and which will necessarily be ruled on in LKQ's lawsuit. As to the law governing each provision, the parties agree that Illinois law governs the RC Agreements. And, as the Court outlined in Sec. I.A.i., *supra*, Rutledge presented

14

**SA14**

no differences between the law the contract provides for (Delaware) and Illinois law, thus failing to provide the Court with a reason to depart from the parties' agreed-upon choice of law. That issue has been decided through disposition of Rutledge's motion to dismiss, and therefore is no longer in dispute.

Finally, Rutledge's third declaratory claim seeks clarification as to which law governs the parties' relationship "generally." The Court has determined that Delaware law governs the RSUAs, and the parties agree Illinois law governs the RC Agreements. As to any other choice-of-law issues which may arise, the Court need not undertake a choice-of-law analysis unless the parties "present an outcome-determinative conflict between the different states on the issue." *See Rust-Oleum*, 2021 WL 5906063, at *5; *see also Bd. of Forensic Document Examiners*, 922 F.3d at 831 (noting that a district court is required to engage in a choice-of-law analysis only where there is a conflict such that a difference in the law will make a difference in the outcome). Rutledge does not identify any choice-of-law issues other than those already addressed by the Court. If more arise, the parties are of course free to inform the Court of the conflicts between the relevant laws.

Rutledge's declaratory judgment counterclaim is duplicative and will be resolved through the resolution of LKQ's claims against him. The motion to dismiss the declaratory judgment counterclaim is granted.

**SA15**

### B. Counterclaim II: Unpaid Wages

Rutledge's second counterclaim for unpaid wages presents a different situation.[4] Rutledge argues he is owed unpaid compensation from LKQ in the form of an equity interest that was to vest periodically pursuant to a provision in the RSUAs. R. 10 at 40-41. Pursuant to that agreement, LKQ provided Rutledge with restricted stock units subject to certain conditions (including the non-compete provision at issue). The contract's forfeiture provision provides that any RSUs that remained unvested at the time of Rutledge's separation from LKQ are forfeited to the company. Rutledge argues the forfeiture provision is unenforceable, and thus he is owed unpaid wages pursuant to the equity interest provisions. This counterclaim is not duplicative, because it will not necessarily be decided via disposition of LKQ's lawsuit. If the Court were to rule that Rutledge was not in breach of his employment contracts, for example, that would not resolve the issue of whether he is owed unpaid wages, because that question requires a different analysis of the equity interest provision and its vesting procedures. LKQ argues the forfeiture provision is enforceable, and thus Rutledge is not owed any unpaid compensation. As already stated, the enforceability of the forfeiture provision will be determined when the Court has the evidentiary record in front of it. For now, Rutledge has sufficiently pled

---

[4] As an initial matter, Rutledge seeks a determination as to what law applies to his counterclaim for unpaid wages. He makes no attempt to differentiate the laws of Delaware, Florida, or Illinois (although he focuses primarily on Illinois law), and simply states that under any of the states' respective wage acts, he has stated a claim. LKQ similarly does not present the Court with differences in the various laws. Thus, there is no reason for the Court to engage in a choice-of-law analysis at this stage.

that an employment agreement existed under which he was entitled to compensation that he did not receive. That is enough at this stage. The motion to dismiss Rutledge's counterclaim for unpaid wages is denied.

As a final note, the parties agree to dismiss Rutledge's third counterclaim for tortious interference. R. 13 at 10; R. 15 at 10. The parties dispute, however, whether the dismissal should be with or without prejudice. At this stage, the Court dismisses Rutledge's tortious interference claim without prejudice, as LKQ has not shown the claim would fail as a matter of law in all circumstances, or in state court.

## Conclusion

For the foregoing reasons, Rutledge's motion to dismiss, R. 28, is granted in part and denied in part. The unjust enrichment claim is dismissed without prejudice. The motion is otherwise denied. LKQ's motion to dismiss, R. 12, is granted in part and denied in part. The declaratory judgment counterclaims are dismissed with prejudice and the tortious interference counterclaim is dismissed without prejudice. The motion is otherwise denied.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: May 27, 2022

**SA17**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LKQ CORPORATION,

        Plaintiff/Counter-Defendant,

v.

ROBERT RUTLEDGE,

        Defendant/Counter-Claimant.

No. 21 C 03022

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

In this case, Plaintiff LKQ Corp. ("LKQ") claims that Robert Rutledge ("Rutledge"), a former employee, violated the non-competition provisions contained in two sets of contracts by working for a competitor. Rutledge counterclaimed for unpaid wages, arguing that he is owed a *pro rata* share of Restricted Stock Units from the first few months of 2021 before he left LKQ. Now before the Court are the parties' cross motions for summary judgment. *LKQ Corp. v. Rutledge*, 21 C 3022 ("R."), ECF Nos. 77, 80. For the following reasons, Rutledge's motion is granted and denied in part, and LKQ's motion is granted and denied in part.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there

**SA18**

is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

LKQ is the nation's largest "supplier of salvaged and recycled automobile parts." R. 79 ¶ 1. Rutledge's entire career has been in the auto salvage and recycling industry. *Id.* ¶ 6. Rutledge started working for LKQ as the Plant Manager of LKQ's Lake City, Florida location in October 2009 when LKQ acquired Rutledge's prior employer, another auto salvage and recycling company. *Id.* ¶¶ 2, 4–5. Rutledge's duties as a Plant Manager for LKQ included, but were not limited to, "overseeing all departments at the facility, overseeing the daily operations of the plant from selling and delivering parts to local customers, and hiring and firing facility employees." *Id.* ¶ 8. He oversaw the Lake City facility's revenue and growth and therefore had access to revenue figures and customer lists and contact information. *Id.* ¶ 9; R. 80-2 ¶13–14. There is some dispute over whether Rutledge was responsible for customer service

or sales, but he at least had access to sales data, interacted with LKQ customers, and managed employees who worked in sales. R. 79 ¶ 10; R. 80-2 ¶ 10; R. 85 ¶ 10.

As part of his employment, LKQ offered Rutledge the ability to receive LKQ Restricted Stock Units ("RSUs"). R. 79 ¶ 15; R. 80-2 ¶¶ 19–20. Each year, Rutledge would receive an enumerated number of shares of LKQ stock based on a vesting schedule, whereby 10% of the stocks vested every six months, on January 14 and July 14 each year. R. 25-8 ("2020 RSUA") at 1; R. 79 ¶ 15; R. 85 ¶ 17. Once the RSUs vested, Rutledge could then opt to sell them on the open market. R. 79 ¶ 15; R. 85 ¶ 17.

In order to receive the RSUs, Rutledge entered into Restricted Stock Unit Agreements ("RSUAs") with LKQ every year from 2013 to 2020. R. 79 ¶ 12; R. 80-2 ¶ 19. The RSUAs contain a section titled, "Non-Competition and Confidentiality," (the "RSUA Non-Compete") which states that Rutledge may not "directly or indirectly [ ] be employed by, engage or have any interest in any business which is or becomes competitive with [LKQ] or its Subsidiaries" for nine months after the termination of Rutledge's employment with LKQ. 2020 RSUA at 5; R. 79 ¶ 13. If Rutledge breached this provision, the RSUs, the shares underlying the RSUs, and any proceeds received by Rutledge from selling the shares "shall be forfeited . . . to [LKQ] without any consideration therefore." 2020 RSUA at 4. The RSUAs also specified that vesting was "subject to [Rutledge]'s continued Service through the applicable vesting date," and that, upon termination of Rutledge's employment, all unvested RSUs would be forfeited to LKQ. *Id.* at 1–2. The parties dispute how many shares of LKQ restricted

**SA20**

stock Rutledge received during his employment with LKQ, as well as the market value of those shares,[1] but agree that Rutledge sold all RSUs that he received. R. 80-2 ¶¶ 31-32; R. 84 ¶¶ 31–32.

Rutledge also signed "Confidentiality, Non-Competition, and Non-Solicitation Agreement[s]" (the "RC Agreements") every year from 2011 to 2020. R. 25-18 ("2020 RC Agreement") at 1; R. 79 ¶ 19. The RC Agreements prohibited Rutledge from "caus[ing], engag[ing] in, represent[ing], furnish[ing] consulting services to, be[ing] employed by or hav[ing] any interest in . . . any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" within 75 miles of any LKQ facility where Rutledge worked, for nine months following the termination of his employment (the "RC Agreement Non-Compete"). 2020 RC Agreement at 2; R. 79 ¶ 19. The RC Agreements stated:

> Employee desires to receive a grant of an equity incentive award from Employer . . . and desires to be employed by (or to continue employment with) Employer . . . in a position in which Employee may receive from Employer or develop for Employer information that Employer desires to keep secret and confidential.

> Employer's desire to keep this information secret and confidential is based on Employer's knowledge that doing so fosters and enhances Employer's competitive advantage in the marketplace for its products and services.

2020 RC Agreement at 1.

---

[1] LKQ claims that Rutledge received 11,414 shares worth a market value of $317,507 and received $639,925 from their sale, which it hopes to claw back. R. 80-2 ¶ 31–32. Rutledge claims that he received 5,146 shares with a market value of $162,651. R. 84 ¶¶ 31–32. Rutledge further explains that LKQ's figures include the sale of unrelated stock options prior to 2013 that were not conditioned on the RSUAs, and that the RSUs he sold to cover his tax liabilities should not be counted. *Id.* ¶ 32.

4

The RSUAs and RC Agreements also contained non-solicitation and non-disclosure of confidential information ("non-disclosure") clauses. R. 79 ¶ 21. LKQ's corporate representative testified that, through these agreements, it sought to protect "specific customer pricing, customer discounts, customer contact information, . . . vendor and supplier pricing, any potential rebates, . . . financial information, revenue, margin data, expense data, profitability data, . . . [and] any marketing strategies for Rutledge's market," but admitted that there are other employees with access to this information who are not subject to such restrictive covenants. *Id.* ¶¶ 25, 27; R. 85 ¶ 27; R. 79-2 (Robert Six Dep. Tr.) at 97–98.

On March 23, 2021, Rutledge announced his resignation from LKQ; April 14, 2021 was his last day. R. 79 ¶¶ 29–30. Rutledge began working for Fenix Auto Parts ("Fenix"), another auto salvage and recycling business and direct competitor of LKQ, within a week. *Id.* ¶ 32; R. 80-2 ¶¶ 34–35. Rutledge started at Fenix as Vice President of Capital Projects.[2] R. 80-2 ¶ 43. In this position, Rutledge worked at his home (which was within 75 miles of LKQ's Lake City facility) approximately 50% of the time; otherwise, he did not work for any Fenix facility within the 75-mile radius.[3] R. 79 ¶¶ 34–35. His primary job responsibilities included purchasing, maintaining,

_____

[2] There is some conflicting testimony that his official title was Vice President of Capital Procurement or Vice President of Capital Procurement and Projects. R. 79 ¶ 33; R. 85 ¶ 33. This dispute is immaterial.

[3] LKQ attempts to dispute this fact by pointing to Rutledge's testimony that he visited one time the Fenix HR building in Jacksonville, Florida, which was within the 75-mile radius. R. 85 at ¶ 36; R. 79-1 (Rutledge Dep. Tr.) at 163–64. But Rutledge testified that he did no work for this facility, and LKQ has pointed to no evidence which disputes this testimony. R. 79-1 at 163–64

5

**SA22**

constructing, and overseeing large assets outside of normal inventory, such as fleet vehicles. *Id.* ¶¶ 37–38; R. 85 ¶ 37. One year after he started at Fenix, Rutledge's job shifted to Area Director, a position in which he supervises the general managers of various Fenix facilities in North Carolina and Florida and spends about half of his time working from home. R. 79 ¶¶ 39–42.

It is uncontested that, despite an investigation by LKQ, LKQ has uncovered no direct evidence that Rutledge solicited any LKQ customers or employees or absconded with any LKQ confidential business information or documents upon his departure from LKQ. *Id.* ¶¶ 48–51. Rutledge admits that, in his current position, he uses his general background and knowledge from his time in the auto salvage and recycling industry, including his time at LKQ. *Id.* ¶ 46. LKQ contends that Rutledge's employment with Fenix hurts its vendor, supplier, and customer relationships. *Id.* ¶ 47.

LKQ therefore sued Rutledge, claiming breaches of the RSUAs and RC Agreements, seeking the forfeiture of Rutledge's proceeds from selling the RSUs from 2013 to present, and requesting injunctive relief prohibiting Rutledge from using LKQ's confidential information, selling LKQ stock, and further breaching the RSUAs. R. 25. Rutledge counterclaimed, contending that he was never paid the *pro rata* share of the RSUs that he had earned from January 2021 to April 2021, when he left LKQ. He claims he is owed 131 LKQ shares, which are worth about $55 a share. R. 79 ¶¶ 58–60. LKQ admits it did not pay him the RSUs, but instead argues that he is not owed the RSUs because the RSUs were not vested. R. 85 ¶¶ 58–60.

Now before the Court is each party's motion for summary judgment. LKQ moves for summary judgment on its claim that Rutledge breached the RSUAs and on Rutledge's claim for unpaid wages. Rutledge moves for summary judgment that the RSUAs and RC Agreements are invalid and unenforceable restraints on trade, that the RC Agreements are unsupported by consideration, and that LKQ has no evidence that he breached the RC Agreements. He also argues there is insufficient evidence to support any claim that he breached the non-solicitation and non-disclosure restrictive covenants and that LKQ's request for injunctive relief is moot. Finally, he seeks summary judgment on his claim for unpaid wages.

The Court will address each argument in turn, starting first with the validity of each Agreement's non-competition provisions.

## Discussion

### I.     The RSUA Non-Competes

Rutledge first argues that the RSUA Non-Competes are post-employment restrictive covenants that are invalid and unenforceable restraints on trade, and the Court should therefore enter summary judgment in Rutledge's favor on Count I. Meanwhile, LKQ moves for summary judgment on Count I, arguing that the undisputed facts show that Rutledge breached the RSUAs.

According to LKQ, the RSUA Non-Compete clauses are not post-employment restrictive covenants, but rather "forfeiture" or "claw back" provisions. *See, e.g.*, *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002) ("Federal cases draw a distinction between provisions that prevent an employee from working for a

7

**SA24**

competitor and those that call for a forfeiture of certain benefits should he do so."). LKQ is right—the RSUAs do not outright prevent Rutledge from competitive conduct; instead, they state that if Rutledge is "employed by . . . any business which is or becomes competitive with [LKQ] or its subsidiaries" within nine months following his separation from LKQ, LKQ may claw back the proceeds he received from the sale of the RSUs.

But even so, under Delaware law (which governs the RSUAs),[4] forfeiture and claw back provisions are subject to the same reasonableness inquiry as other post-employment restrictive covenants. *Ainslie v. Cantor Fitzgerald*, No. 9436-VCZ, 2023 WL 106924, at *24 (Del. Ct. Chan. Jan. 4, 2023). A non-competition agreement is reasonable only if it: (1) is "reasonable" in temporal and geographic scope; (2) protects a legitimate business interest of the employer; and (3) "survives a balancing of the equities." *FP UC Holdings, LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ct. Chan. Mar. 27, 2020). When weighing the equities, the Court focuses on whether the non-competition clause is "essential for the protection of the employer's economic interests," and weighs this interest against the employee's interests. *Id.* The Court will not enforce a provision if doing so "would impose an unusual hardship on a former employee." *Id.* (citing *Norton Petroleum Corp. v. Cameron*, No. CIV.A. 15212-NC, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998)). There must also "be a reasonable relationship between the value of the benefits passing to the corporation [via the promise not to compete] and the value of the [stock]

---

[4] *See* R. 58 at 4–6 (ruling that Delaware law applies to the RSUAs).

options granted." *W.R. Berkley Corp. v. Dunai*, No. 1:19-cv-01223, 2021 WL 1751347, at *2 (D. Del. May 4, 2021) (quoting *Beard v. Elster*, 160 A.2d 731, 737 (Del. 1960)). When applying this balancing test, "the court should take notice of the consideration an employee received in exchange for her promise not to compete before determining whether the non-compete is reasonable." *Hamilton*, 2020 WL 1492783, at *6.

In exchange for his agreement to comply with the RSUAs, Rutledge received RSUs valued between $130,000 and $340,000 over eight to ten years[5] (the parties dispute the market value of the stock he received with respect to the RSUs). And LKQ claims (though Rutledge disputes) that Rutledge received proceeds of over $640,000 in selling those RSUs. His annual salary at LKQ was $109,000, and his salary at Fenix is $139,000. R. 80-2 at ¶¶ 16, 47. LKQ argues, therefore, that the RSUs provided Rutledge a windfall for the small price of promising not to work for any LKQ competitor for nine months following separation. But divided over the time that Rutledge worked at LKQ, the stock benefits provided Rutledge with moderate additional compensation per year, not a huge all-at-once windfall. And the forfeiture provision, which seeks the return of the total amount of proceeds over the entirety of Rutledge's employment, is untethered from LKQ's interests in protecting its confidential information and vendor or customer relationships.

For example, in *Ainslie*, a company sought to enforce a provision which required a partner to forfeit his entitlement to large amounts of future compensation

---

[5] The RSUAs govern eight years, between 2013 and 2021. Rutledge claims that LKQ's calculations take into account RSUs he received over ten years, from 2011 to 2021. R. 84-1 at ¶ 11.

9

if he performed any work for any competing business for one year. 2022 WL 18107003, at *16. The court there, holding that forfeiture provisions are not entitled to deference, likened the clause at issue to a liquidated damages provision, which is disfavored in Delaware. *Id.* at *24. In other words, because the amount of money the former partner would have to forfeit under the provision for any competitive conduct was "not tethered to any competition that actually harms [the employer]," it served as a punishment for breaching the contract. *Id.* at *23. And because such a liquidated damages provision "[i]s exercised without heed to whether the employee's actions had actually harmed the former employer, it would create the same undue chilling effect on employment and upward mobility as a restrictive covenant[,] . . . has an unlawful *in terrorem* purpose and effect, and is unenforceable because the restraint . . . is not reasonable." *Id.* at *23 (cleaned up) (quoting *Faw, Casson & Co., LLP v. Halpen*, No. CIV.A 00C-01-015, 2001 WL 985104, at *2–3 (Del. Sup. Ct. Aug. 7, 2001)). The *Ainslie* court further found the lack of geographic scope and ban on any employment with any business competitive with the employer or its affiliates unreasonable. *Id.* at *17.

LKQ argues that *Ainslie* is inapplicable because it involved a condition precedent to future compensation rather than a claw back. LKQ also points to different Delaware case law where courts have refused to draw such a parallel between forfeiture/claw back provisions and liquidated damages provisions. *See W.R. Berkley Corp. v. Hall*, No. 03C-12-146WCC, 2005 WL 406348, at *5 (Del. Super. Ct. Feb. 16, 2005). But the RSUA Non-Competes are even closer to liquidated damages provisions than the forfeiture provision in *Ainslie*. Rather than limiting Rutledge's

10

**SA27**

ability to receive future compensation from LKQ or requiring him to return stock options, it requires him to give LKQ all the proceeds he received in selling the RSUs over the course of eight years—in an amount LKQ contends is nearly five times his current annual salary. These financial consequences are detrimental to Rutledge and unrelated to LKQ's loss. Indeed, LKQ admitted that it has no direct evidence that Rutledge solicited any LKQ customer or employee or absconded with LKQ confidential information. And even if he did, the proceeds Rutledge received in selling his RSUs have nothing to do with any loss that LKQ could suffer by a former middle-management employee working for a competitor. LKQ does not explain how Rutledge, in his position for Fenix overseeing large capital projects unrelated to normal car part inventory,[6] has hurt LKQ's customer, vendor, or supplier relationships. And, in seeking the proceeds (i.e., profit) on the sale of the RSUs, rather than the initial market value of the RSUs or any of the stock itself, the RSUA Non-Competes become further unmoored from any argument that LKQ is attempting to prevent a gift of corporate assets or ensure its stock owners' interests are aligned with the company's.

And like the provision that was found to be unenforceable in *Ainslie*, the RSUA Non-Competes bar an employee from working in *any* position for *any* company that is prejudicial to or in conflict with LKQ or its subsidiaries without geographic limitation. Rutledge argues that he would be barred from even working as a janitor at Fenix. Though hyperbolic, the Court sees no language in the RSUA Non-Competes

---

[6] Rutledge's subsequent position as Area Manager for Fenix is irrelevant because he started it in April 2022, which is outside the nine-month restriction period.

that makes Rutledge's argument inaccurate. Rutledge, who has spent the entirety of his professional life in the auto salvage and recycling industry, is therefore totally barred from seeking a living in the only industry he has ever known for nine months or must pay, according to LKQ, over $640,000. This is certainly the type of provision which acts more as a punishment than a protection of LKQ's interests. It has an "unlawful *in terrorem* effect" on a mid-level managerial employee and therefore operates as an unreasonable restraint on trade. *Ainslie*, 2023 WL 106924, at *23.

LKQ cites several cases which have upheld forfeiture provisions, but they are distinguishable. First, LKQ's cases were decided under the arbitrary and capricious standard, rather than the reasonableness standard, because the courts were reviewing administrative committee decisions. *Hall*, 2005 WL 406348, at *2 ("[W]hen a stock option committee is vested with final, binding and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith."); *see also JPMorgan Chase & Co. v. Pierce*, 517 F. Supp. 2d 954, 962–64 (E.D. Mich. 2007) (administrative committee's decision to claw back former officer's stock gains was not made in bad faith).

Second, the forfeiture provisions in those cases placed less of an undue burden on the employee and were more comparable to the losses the companies suffered by the employee's breaches. For example, the provisions sought forfeitures of the stocks themselves or their "granted value" rather than the employee's total "proceeds." *Dunai*, 2021 WL 1751347, at *2 ("[S]he had to forfeit the stock or repay the granted

value. . . . And if the stock price had gone up between the grant and the repayment, she could . . . still come out ahead. Nothing about that is unreasonable."); *Hall*, 2005 WL 406348, at *2 (employee only had to forfeit the proceeds gained on stock options exercised within six months after termination). Some required forfeiture for benefits received over a much shorter period before the breach, rather than the entirety of the stock issued over the course of the employment (here, eight years' worth). *Pierce*, 517 F. Supp. 2d at 957 (provision required repayment of proceeds received on stock options exercised one year prior to termination); *Hall*, 2005 WL 406348, at *2 (company sought reimbursement for six months' worth of stock options). These cases also involved narrower non-compete language aimed at very high-level employees, such as corporate vice presidents, rather than middle-management employees. *Dunai*, 2021 WL 1751347, at *1 (corporate vice president); *Pierce*, 517 F. Supp. 2d at 956 (senior vice president prohibited from "perform[ing] the same or substantially similar functions" for a competitor); *Hall*, 2005 WL 406348, at *2 (senior vice president who was one of the top three employees in the company). In other words, unlike this case, the forfeitures sought in LKQ's cited cases were reasonable because they were commensurate with the actual losses suffered by the companies due to competitive action by high-level employees.

Because the RSU Non-Competes are unenforceable, the Court need not reach LKQ's argument that Rutledge breached their terms. Rutledge's motion for summary judgment on LKQ's breach of the RSUAs count is granted, and LKQ's motion on the same count is denied.

13

**SA30**

### II.    The RC Agreement Non-Competes

The Court turns next to the RC Agreement Non-Competes. Unlike the RSUA Non-Competes, the RC Agreement Non-Competes are traditional post-employment restrictive covenants. They prohibit Rutledge from being employed, in any capacity, "by any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" within a 75-mile radius of the Lake City facility where Rutledge worked for nine months post-employment. 2020 RC Agreement at 2. Rutledge argues that this, too, is an unenforceable restraint on trade under Illinois law.[7] He further argues that it lacks consideration, and that there is insufficient evidence that he breached it. The Court finds that the RC Agreement is also an invalid and unenforceable restraint on trade under the totality of the circumstances.

In Illinois, "courts favor fair competition and disfavor restraints of trade[,] [and] noncompetition clauses are closely scrutinized." *Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill. App. 3d 114, 117 (1994). Like Delaware, Illinois applies a test asking whether a post-employment restrictive covenant not to compete is "reasonably necessary to protect the interests of the employer" to determine whether it is enforceable. *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 716 (N.D. Ill. 2014) (quoting *McRand, Inc. v. Van Beelen*, 138 Ill. App. 3d 1045, 1051 (1985)). Whether an employer maintains a legitimate business interest in a non-compete clause is just one factor of reasonableness to be decided under the totality of the circumstances. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. 2011).

---

[7] Illinois law governs the RC Agreements. *See* R. 58 at 9.

This determination may include considerations such as the permanence of customer relationships and the employee's acquisition of confidential information. *Id.*

The employer's interest in the restrictive covenant is then measured against "its hardship to the defendant, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions." *Miessen*, 998 F. Supp. 2d at 716–17 (citing *McRand*, 138 Ill. App. 3d at 1051). Restrictions on activities "should be narrowly tailored to protect only against activities that threaten the employer's interest." *Lawrence & Allen, Inc. v. Cambridge Human Resource Grp., Inc.,* 292 Ill. App. 3d 131, 140 (1997).

Rutledge first contends that LKQ does not have a legitimate business interest in enforcing the RC Agreements. LKQ alleges that Rutledge had access to LKQ's confidential information, such as its customer lists, and financial information like revenue figures, sales data, pricing, and profitability. And, by working in his initial position at Fenix, LKQ contends that Rutledge harmed its vendor, supplier, and customer relationships. Rutledge maintains that LKQ's interests are protected by the non-solicitation and non-disclosure covenants in the RC Agreements, and LKQ has cited no direct evidence that he harmed LKQ's vendor, supplier, or customer relationships or misappropriated any confidential information.

First, it is unclear how a former Plant Manager working for a competitor would injure LKQ's vendor or supplier relationships, and LKQ does not offer any explanation. LKQ does not allege that Rutledge contacting LKQ's suppliers would somehow injure it, such as by causing its suppliers to stop servicing LKQ or to raise

15

**SA32**

their prices. This Court was also unable to find a single Illinois case that recognized the protection of supplier and vendor relationships as a legitimate business interest under a non-compete. *See Unisource Worldside, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003) (identities of suppliers were not proprietary information to support legitimate business interest). LKQ also cites no evidence that Rutledge, in his position as Vice President for Capital Projects for Fenix, had any authority to solicit customers or use the confidential information he gained from his employment at LKQ, as he testified that he uses his own general knowledge he gained during his time in the industry. Finally, LKQ admits that there are employees with access to the same information as Rutledge who are not required to enter such non-competition contracts. But even if the Court assumes that the protection of LKQ's confidential information and vendor, supplier, and customer relationships are legitimate business interests, the RC Agreement Non-Competes go well beyond protecting these interests into overbreadth.

Though the RC Agreements contain a geographic limitation that does not exist in the RSU Non-Competes, the provisions are nonetheless unreasonable. To begin, Illinois courts have upheld restrictive covenants with geographic limitations that align with the employer's interests. For example, a non-compete provision which banned a radio talk show host from engaging in similar employment with another radio station within 100 miles was reasonable because it left open many positions in the broadcasting industry, and 100 miles was the geographic radius of a strong radio station signal. *Midwest Tel., Inc. v. Oloffson*, 298 Ill. App. 3d 548, 557 (1998). And a

ten-mile geographic restriction that was coextensive with where the employer did business was similarly aligned to protecting the employer's interests. *Prairie Eye Ctr., Ltd. v. Butler*, 329 Ill. App. 3d 293, 297–98 (2002). But when a geographic limitation is arbitrary and not related to the protection of the employer's interests, it weighs against a finding of reasonableness. *See Medix Staffing Solutions, Inc. v. Dumrauf*, No. 17 C 6648, 2018 WL 1859039, at *3 (N.D. Ill. April 17, 2018) (50-mile geographic limitation unreasonable because it was unrelated to the employer's area of service); *see also McNicholl Counseling, P.C. v. Jenkins*, 2023 IL App (5th) 220732-U, at ¶¶ 37–39 (same). Seventy-five miles is a large geographic limitation, but not extremely restrictive, given that LKQ has a national reach. But LKQ does not explain why a 75-mile sphere of protection around Lake City, Florida is reasonably necessary to the protection of its interests. It does not allege, for example, that any of its customers are within that radius.

But most concerning is the total ban on employment with any business that is competitive with LKQ or its subsidiaries. Like the RSUA Non-Competes, the RC Agreement Non-Competes contain a blanket ban on all activities for competitors. Illinois courts and federal courts applying Illinois law have found similar contracts unenforceable, even when the contracts contained geographic and temporal limitations. *See Dumrauf*, 2018 WL 1859039, at *3 (non-compete barring any employment by competitor or potential competitor in any capacity within 50 miles is unenforceable); *Miessen*, 998 F. Supp. 2d at 717 (non-compete which prohibited "engaging in any business substantially related to the business" of the employer was

17

**SA34**

overbroad); *Hay Grp., Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415, at *3 (N.D.
Ill. Sept. 29, 2005) (non-compete which was a total restraint on the employee's ability
to engage in his occupation invalid); *Cambridge Eng'g, Inc. v. Mercury Partners 90
BI, Inc.*, 378 Ill. App. 3d 437, 452 (2007) (finding a non-compete which barred the
employee from "pursuing work with" any business competitive with employer or its
affiliates in any capacity to be "patently overbroad"); *Eichmann v. Nat'l Hosp. and
Health Care Servs., Inc.*, 308 Ill. App. 3d 337 (1999) (Illinois courts are "hesitant to
enforce noncompetition agreements that prohibit employees from soliciting or
servicing not only customers with whom they had direct contact, but also customers
they never solicited or had contact with while employed."). Non-competes that are
upheld are generally limited to the employee conducting similar work for competitors.
*See, e.g.*, *Oloffson*, 298 Ill. App. 3d at 557; *Butler*, 329 Ill. App. 3d at 297–98.

The non-compete here is a total bar on Rutledge working for any competitor of
LKQ or its subsidiaries in any position, despite the limited arenas in which Rutledge's
knowledge or contacts would be useful to a competitor. As discussed above, even if he
worked as a janitor for Fenix, he would still be violating the terms of the contract,
though no interest of LKQ would be harmed. And again, there is no direct evidence
that Rutledge has actually harmed LKQ's interests, misappropriated confidential
information, or solicited any of LKQ's customers during the nine month limitations
period. Indeed, Rutledge's position as Vice President of Capital Projects involved
managing large, capital assets, not contacting car part suppliers or customers or
conducting pricing, customer service, sales, or financial tasks. In sum, because the

18

**SA35**

RC Agreement Non-Competes are also overbroad, they are unenforceable against Rutledge, and the Court need not address the remainder of Rutledge's arguments.[8] His motion for summary judgment is therefore granted as to Count II.

## III.    Non-Solicitation and Non-Disclosure Restrictive Covenants

Rutledge next argues that, to the extent LKQ is seeking to assert that Rutledge violated the non-solicitation and non-disclosure covenants, LKQ lacks proof to support these claims. LKQ stated in its opposition brief that it is not seeking to enforce the non-solicitation covenant. R. 83 at 13 n.4. But its brief is silent on whether it seeks to enforce the non-disclosure covenant. Though it is unclear if LKQ is seeking to assert this claim, it cannot establish that Rutledge violated the non-disclosure clause. LKQ, which has the burden of proof, admits that it has no direct evidence that Rutledge absconded with or is misappropriating its confidential information. It is appropriate to grant summary judgment when the party with the burden of proof lacks the ability to establish an essential element of its case. *Celotex*, 477 U.S. at 322–23. Therefore, to the extent LKQ is seeking to enforce the non-disclosure restrictive covenant, summary judgment in favor of Rutledge is granted. Rutledge's motion as to the non-solicitation covenant is denied as moot.

## IV.    Claim for Injunctive Relief

---

[8] LKQ asks that the Court "blue pencil" or modify the agreements if the Court finds them to be overbroad. But the Court will not do so because "as the Illinois Appellate Court and courts in this District have recognized, modifying an extremely overbroad non-compete agreement could provide a disincentive for employers and employees to draft narrow and precise agreements." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 815 (N.D. Ill. 2011).

Rutledge also seeks summary judgment on LKQ's claim for injunctive relief. In Count IV of its Amended Complaint, LKQ seeks to enjoin Rutledge from disclosing confidential information, engaging in competitive conduct under the RSUA Non-Competes and RC Agreement Non-Competes, and exercising or selling RSUs. R. 25 at pp. 20–22. First and foremost, LKQ cannot seek to enforce an unenforceable non-compete provision. *Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345, 351 (2003) ("The propriety of injunctive relief based on a covenant not to compete depends on the enforceability of that covenant," (internal citations omitted)). And because there is no evidence that Rutledge has violated the non-disclosure covenants, LKQ will not be irreparably harmed absent the issuance of an injunction. Finally, LKQ's requests are moot because (1) the nine-month enforcement period in the RSUAs and RC Agreements expired; and (2) Rutledge does not own any RSUs. Therefore, Rutledge's motion for summary judgment on Count IV is granted.

### V. Rutledge's Claim for Lost Wages

Finally, each side moves for summary judgment on Rutledge's claim for lost wages. Rutledge alleges that he is owed a *pro rata* share of the RSUs he "earned" from January to April 2021. According to Rutledge, LKQ owes him 131 shares of LKQ restricted stock for that period. LKQ admits that it did not pay Rutledge any RSUs from that period, but instead alleges that these RSUs were unvested at the time he left LKQ, and that, under the RSUAs, Rutledge has no claim to them. The RSUAs provide that a portion of the RSUs vest on a six-month schedule every January 14 and July 14, "subject to [Rutledge]'s continued Service through the applicable vesting

date . . . ." 2020 RSUA at 1.[9] Rutledge was to forfeit any unvested RSUs upon termination of employment. *Id.* at 2.

First, Rutledge does not have a contractual right to the RSUs he is seeking. The RSUAs are clear that the RSUs vest on specific dates every six months, in January and July. There is no dispute that the RSUs Rutledge is seeking were unvested as of the date he left LKQ—they were scheduled to vest in July 2021. Under the RSUAs, it is a condition precedent to receive RSUs that the employee remains employed by LKQ *"through the applicable vesting date."* 2020 RSUA at 1 (emphasis added). Rutledge did not; he left LKQ in April 2021. Upon termination of employment, Rutledge's future rights to unvested RSUs were forfeited to LKQ.

Rutledge claims that the RSUs were part of his wages and compensation that he earned, and he therefore has a statutory right to them under *Regan v. BP Prods. N. Am.*, No. 1:17-cv-09208, 2020 WL 127954, at *4–5 (N.D. Ill. Jan. 10, 2020), which applied the Illinois Wage Payment and Collections Act ("IWPCA"). But the RSUAs are dictated by Delaware law, not Illinois law. And even so, the IWPCA applies only to employees who work in Illinois. *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1174–75 (N.D. Ill. 2016), *aff'd*, 843 F.3d 660 (7th Cir. 2016). Rutledge provides no evidence that he worked in Illinois at any time. Even so, *Ragan* is distinguishable because the court there found that RSUs were an "earned" bonus under the IWCPA

_____

[9] The RSUAs have a severability provision. 2020 RSUA at 3 ("In the event that any part of this Agreement shall be held to be invalid or unenforceable, the remaining parts hereof shall nevertheless continue to be valid and enforceable."). The Court's finding that the RSUA Non-Competes are unenforceable does not affect the enforceability of the remainder of the RSUAs.

so long as the employee had complied with the contractual conditions precedent to the receipt of the RSUs. 2020 WL 127954, at *4. The court found that the employee had met those contractual conditions—in that case, he work for the employer for a certain amount of time. *Id.* But here, Rutledge does not meet the contractual conditions laid out in the RSUAs because RSUAs require that, to receive any RSU, Rutledge must be employed by LKQ as of the vesting date. *See, e.g., McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 541 (2009) (finding plaintiff was not entitled to a *pro rata* share of a bonus prior to termination where the conditions precedent to receiving the bonus were not met); *see also Tatom v. Ameritech Corp.*, No. 99 C 683, 2000 WL 1648931, at *8–9 (N.D. Ill. Sept. 28, 2000), *aff'd* 305 F.3d 737 (7th Cir. 2002) (conditional stock options were not wages or earned bonuses such that employee had right to *pro rata* share under the IWCPA).[10] Therefore, on Rutledge's counterclaim for unpaid wages, LKQ's motion for summary judgment is granted and Rutledge's motion for summary judgment is denied.

## CONCLUSION

---

[10] In his motion for summary judgment and briefs responding to LKQ's arguments, Rutledge provides no other legal basis supporting his right to the unvested RSUs, though his complaint makes claims in the alternative under Illinois, Delaware, and Florida law. Even if he had argued under Delaware or Florida law, the outcome would be the same. *See vMedex, Inc. v. TDS Operating, Inc.*, No. 18-1662, 2021 WL 1737298, at *9 (D. Del. May 3, 2021) (dismissing a breach of contract claim that a former employer failed to pay unvested RSUs because the contract provided for the forfeiture of unvested RSUs if the employee was not employed on the date for vesting); *Lincare Holdings Inc. v. Ford*, 307 So. 3d 905, 910 (Fla. Dist. Ct. App. 2020) (finding that an employee's already "earned" commission was forfeitable at termination because the employment contract provided for such a forfeiture).

For the foregoing reasons, Rutledge's motion for summary judgment (R. 77) is granted as to Counts I, II, and IV,[11] and denied as to his counterclaim for unpaid wages. LKQ's motion for summary judgment (R. 80) is granted as to Rutledge's counterclaim for unpaid wages and denied as to Count I. As there are no outstanding claims in this matter, judgment shall enter, with each party bearing its own costs.

.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: June 13, 2023

---

[11] This Court dismissed Count III when it granted in part Rutledge's motion to dismiss. R. 58.

**SA40**

ILND 450 (Rev. 10/13) Judgment in a Civil Action

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

LKQ Corporation,

Plaintiff(s),

v.

Rutledge,

Defendant(s).

Case No.  1:21-cv-03022
Judge Thomas M. Durkin

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

which ☐ includes    pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

_____

☐      in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

_____

☒      other: Robert Rutledge's motion for summary judgment is granted as to Counts I, II, and IV, and denied as to his counterclaim for unpaid wages. LKQ Corporation's motion for summary judgment is granted as to Rutledge's counterclaim for unpaid wages and denied as to Count I. Each party shall bear its own costs.

_____

This action was *(check one)*:

☐ tried by a jury with Judge    presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☒ decided by Judge Thomas M. Durkin on a motion for summary judgment.

Date:  6/13/2023            Thomas G. Bruton, Clerk of Court

                                 E. Wall, Deputy Clerk

# SA41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LKQ CORPORATION, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-03022 |
| | ) | |
| ROBERT RUTLEDGE, | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant/Counter-Claimant. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that LKQ Corporation, the Plaintiff/Counter-Defendant in the above

named case, hereby appeals to the United States Court of Appeals for the Seventh Circuit from:

1.    The District Court's Order of June 13, 2023 [ECF #92] granting

Defendant/Counter-Claimant Robert Rutledge's summary judgment motion on Counts I, II and

IV, and denying LKQ Corporation's summary judgment motion on Count I; and

2.    The District Court's Order of Judgment of June 13, 2023 [ECF #93] granting

Defendant/Counter-Claimant Robert Rutledge's summary judgment motion on Counts I, II and

IV, and denying LKQ Corporation's summary judgment motion on Count I; and

3.    The District Court's Order of May 27, 2022 [ECF # 58] dismissing LKQ's claim

for unjust enrichment.

Dated:  July 5, 2023                                          Respectfully submitted,


                                              By:      /s/ *Craig R. Annunziata*
                                                       One of the Attorneys for Plaintiff,
                                                       LKQ Corporation


Craig R. Annunziata
cannunziata@fisherphillips.com
Jason D. Keck

1

## SA42

jkeck@fisherphillips.com
James M. Hux, Jr.
jhux@fisherphillips.com
FISHER & PHILLIPS, LLP
10 S. Wacker Drive, Suite 3450
Chicago, IL 60606
(312) 346-8061 (TEL)
(312) 346-3179 (FAX)

## CERTIFICATE OF SERVICE

The undersigned attorney of FISHER & PHILLIPS LLP, certifies as follows:

That on July 5, 2023, I electronically filed the foregoing **NOTICE OF APPEAL** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Tiffany L. Carpenter
Joseph Barber
Howard & Howard Attorneys
PLLC 200 S. Michigan Ave.
Suite 1100
Chicago, IL  60604

*Attorneys for Defendant*

thereby serving the same upon them.

By:      /s/ *Craig R. Annunziata*
One of the Attorneys for LKQ Corporation

2

**SA43**